**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| SEAN PRIEWE, Individually and On Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   v.<br><br>BIGBEAR.AI HOLDINGS, INC., LOUIS R. BROTHERS, AMANDA LONG, JOSHUA KINLEY, JULIE A. PEFFER, SEAN RICKER, and AE INDUSTRIAL PARTNERS, LP (F/K/A AE INDUSTRIAL PARTNERS, LCC)<br><br>               Defendants. | Case No. 1:25-cv-00623-PTG-WEF<br><br><u>CLASS ACTION</u> |

**CONSOLIDATED CLASS ACTION COMPLAINT FOR**
**<u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

JURISDICTION AND VENUE ................................................................................. 13

PARTIES ................................................................................................................... 14

FORMER BIGBEAR EMPLOYEES ........................................................................ 17

BACKGROUND ....................................................................................................... 23

    The Origin of BigBear.ai and the 2026 Convertible Notes ................................. 23

    BigBear Fails to Bifurcate the Conversion Option from the Debt Obligation in
        Accounting for 2026 Convertible Notes .................................................... 26

    Defendants' Myopic Focus on Reducing and Minimizing Costs and Dysfunctional
        Leadership Translated Into a Dumpster Fire of an Accounting/Finance
        Team ......................................................................................................... 29

    AE Closely Controlled BigBear Through the Company's Board of Directors and
        Operated BigBear in AE's Own Interests .............................................. 32

    Defendants Misled Investors About the State of BigBear's Internal Controls ......... 37

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF
    MATERIAL FACTS ........................................................................................ 38

        A.    Year-End Annual Report for 2021 ............................................. 38

        B.    Year-End Annual Report for 2022 ............................................. 43

        C.    Quarterly Reports for Fiscal Year 2023 ..................................... 45

        D.    Year-End Annual Report for 2023 ............................................. 49

        E.    Quarterly Reports for Fiscal Year 2024 ..................................... 53

THE TRUTH BEGINS TO EMERGE ....................................................................... 56

        A.    The Clear Nature of the Accounting Rule Violated in Accounting for the
        2026 Convertible Notes Evidences Defendants' State of Mind ............................ 61

      B.      The Deficiencies in BigBear's Accounting and Finance Capabilities Were Glaring; the Company Misrepresented That it Had Remediated Deficiencies in Internal Controls Over Financial Reporting ...............................63

      C.      Defendant AE Dumped Hundreds of Millions of Shares of BigBear Stock While Knowing of the Unremediated Deficiencies in BigBear's Internal Controls, the Company's False and Misleading Statements, and BigBear's Impending Need to Restate Financials Going Back to Year-End 2022................65

LOSS CAUSATION/ECONOMIC LOSS ........................................................................71

CLASS ACTION ALLEGATIONS .................................................................................74

FRAUD ON THE MARKET...........................................................................................76

AFFILIATED UTE RELIANCE ......................................................................................76

COUNT I .......................................................................................................................77

For Violations of Section 10(b) of the Exchange Act......................................................77

and Rule 10b-5 Against all Defendants ...........................................................................77

COUNT II ......................................................................................................................78

For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants............78

COUNT III......................................................................................................................82

For Violations of Section 20A of the Exchange Act ....................................................82

(Against Defendant AE Industrial Partners, LP) .........................................................82

PRAYER FOR RELIEF ..................................................................................................84

JURY TRIAL DEMANDED............................................................................................84

1.      Lead Plaintiffs Ning Sun and Yan Zeng allege the following based on the investigation conducted by their attorneys. This investigation included, but was not limited to, review and analysis of (i) BigBear.ai Holdings, Inc.'s ("BigBear" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) transcripts of BigBear's public conference calls, (iii) BigBear's press releases, (iv) independent media reports regarding BigBear, (v) securities analysts' reports and advisories about the Company, (vi) other public statements issued by the Company, (vii) media reports about the Company, (viii) the Verified Class Action Complaint filed in *Bushansky v. GigAcquisitions4, LLC*, C.A. No. 2023-0685-VCW (Del. Ch. July 5, 2023), and (ix) interviews of former Company employees ("FE"). Lead Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## INTRODUCTION

2.      This is a securities class action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5, 17 C.F.R. § 240.10b-5, as promulgated thereunder, against Defendants BigBear, former Chief Executive Officer ("CEO") Louis R. Brothers, former CEO Amanda Long, Former Chief Financial Officer ("CFO") Joshua Kinley, former CFO Julie A. Peffer, former Chief Accounting Officer ("CAO"), and current CFO Sean Ricker; and alleging violations of Section 20A of the Securities Exchange Act of 1934, 15 U.S.C. §78t-1, against private equity firm and former controlling shareholder AE Industrial Partners, LP (f/k/a AE Industrial Partners, LCC) ("AE").

3.      This action is brought on behalf of all investors who purchased BigBear common stock during the period March 31, 2022 through March 25, 2025 ("Class Period"). Lead Plaintiffs allege Defendants made false and misleading statements and failed to disclose material facts which caused BigBear's stock to trade at artificially inflated and artificially maintained prices.

Furthermore, Lead Plaintiffs allege that Defendant AE sold shares of BigBear stock at artificially inflated and maintained prices while in possession of material nonpublic information. Lead Plaintiffs and Class members purchased BigBear common stock at these inflated prices, and Lead Plaintiffs and Class members suffered losses when the truth was revealed and BigBear's stock price plummeted.

4.    Present day BigBear is the product of numerous mergers effectuated by Defendant AE, a private equity firm, who initially merged three of its portfolio companies into privately held predecessor entity, BigBear.ai, before then causing publicly traded Defendant BigBear to merge with two additional AE portfolio companies. In December 2020, NuWave Solutions acquired BigBear, Inc. Then, in February 2021, NuWave merged with PCI Strategic Management to form BigBear.ai. BigBear.ai went public on December 7, 2021 by completing a merger with GigCapital4, Inc., a special purpose acquisition corporation ("SPAC");[1] the resulting entity was renamed BigBear.ai Holdings, Inc. (the present company and defendant). Shortly after becoming a publicly traded company, BigBear acquired ProModel Corporation on April 11, 2022. And finally, on March 1, 2024, BigBear announced it had acquired Pangiam Intermediate Holdings, LLC. Each of these companies was majority owned and controlled by AE, which, according to the Company's 2021 10-K filed March 31, 2022, owned 83.5% of outstanding equity following close of the SPAC merger. AE held 75.2% of BigBear's equity (approximately 165 million shares) at the start of March 2024.

---

[1] A special purpose acquisition company is a shell company that raises money through an initial public offering with the intention to merge with a private operating company to transition the private operating company to a public traded company. SPACs, INVESTOR.GOV, https://www.investor.gov/introduction-investing/investing-basics/glossary/spacs (last visited July 23, 2025).

5. BigBear describes itself as "an AI-driven technology solutions company" that provides both software and services for it its customers. BigBear claims to "provide technology that helps organizations operationalize AI: making faster, more informed decisions by analyzing complex data and providing actionable insights in areas of critical national security, defense and related markets." Many of BigBear's customers use BigBear's resources to supplement their own in-house technical and operational staff. The company is headquartered in McLean, Virginia.

6. BigBear's December 7, 2021 SPAC merger began with a merger agreement entered into by BigBear.ai Holdings and GigCapital4, Inc. in June 2021. GigCapital was required to have $350 million in cash as a condition of the merger. GigCapital and AE needed to raise additional funds to consummate the merger, so they solicited investment in post-merger BigBear, aiming to secure $150 million through a PIPE (private investment in public equity). But prospective investors balked at GigCapital and AE's $2.11 billion valuation of BigBear.ai. AE and GigCapital pivoted to instead raising funds through a convertible note offering. Convertible notes are debt instruments that can be converted into equity at a future date. GigCapital and AE also entered into a $75 million backstop agreement (providing an affiliate of AE would purchase up to 7.5 million shares of GigCapital stock at $10 per share) to support the merger.

7. Upon completion of the merger, BigBear issued $200 million of unsecured convertible notes due to mature on December 15, 2026 (the "2026 Convertible Notes" or "2026 Notes"). The 2026 Convertible Notes bear interest at a rate of 6.0% per annum, payable semi-annually, and initially convertible into 17,931,304 shares of BigBear's common stock at a conversion price of $11.50 per share. But the conversion price was subject to adjustments, including a Conversion Rate Reset 180 days after December 7, 2021 should certain daily

volume-weighted average price thresholds be met. Essentially, if, on the 180th day after the SPAC merger, the daily volume-weighted average trading price over the preceding 30 days dropped below $10 per share, the conversion price could be reset to as low as $9.78 per share, which would in turn increase the number of shares issued in the event of a conversion to as high as 23,058,494. These conversion price and quantity adjustments were notable because the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") rules mandate different accounting treatments for debt instruments depending on whether they are "fixed-for-fixed," *i.e.* indexed to an entity's own stock.

8.    BigBear confirmed in its first post-merger SEC report (the 2021 Annual Report on form 10-K, filed March 31, 2022) that its "consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America" ("GAAP")." The single source of GAAP is the FASB's ASC.

9.    Under ASC 815-15-55-218, an issuer is required to bifurcate and separately account for a convertible debt instrument embedded within a host contract (such as the conversion option within the 2026 Convertible Notes) if the conversion option is not indexed to the issuer's own stock. For the conversion option to be indexed to the issuer's stock, ASC 815-40-15 explains that the settlement amount must be equal to the difference between the fair value of a **fixed** number of equity instruments and the **fixed** strike price of the option. ASC 815-40-15-7D makes clear, however, that "[a]n instrument's strike price or the number of shares used to calculate the settlement amount **are not fixed if its terms provide for any potential adjustment**, regardless of the probability of such adjustment(s) or whether such adjustments are in the entity's control." (emphasis added).

10.     The Conversion Rate Reset provision of the 2026 Convertible Notes meant the 2026 Notes' conversion option was clearly *not* indexed to BigBear's stock, because **the number of shares and strike price for those shares were subject to adjustment**. But BigBear erroneously deemed the conversion option fixed-for-fixed—in clear violation of this simple, binary GAAP provision—and therefore excepted from the need to be separately accounted for as a derivative instrument. In other words, ASC 815-40-15-7D provides for a clear rule: if the conversion option is subject to adjustment—which the 2026 Convertible Notes clearly were—then the conversion option had to be accounted for separately. This improper accounting treatment caused the Company's reported financials in every quarterly and annual report filed with the SEC until the Company's 2024 Annual Report, filed on SEC Form 10-K to be materially misstated.

11.     Although this determination—whether the conversion option in the 2026 Convertible Notes was indexed to BigBear's stock (and therefore exempt from bifurcation from the 2026 Notes as an embedded derivative)—was straightforward, properly bifurcating the conversion option in the 2026 Notes would have required BigBear to redetermine the fair value of the conversion option (separate from the 2026 Notes) for each quarterly and annual reporting period. This costly and complex analysis would have required maintaining a deep and experienced in-house accounting team and would have introduced an additional source of quarterly variability to BigBear's reported financials.

12.     The effect of not accounting for the 2026 Convertible Notes in accordance with GAAP led to BigBear significantly understating the cost of its debt issuance and understating its reported losses. In particular, in 2023, BigBear understated its losses by over $10 million, or almost 17%. This was material as, as we discuss herein, AE sold out of its entire holdings in

BigBear *before* the Company announced the need to restate its financial results and properly account for the 2026 Convertible Notes and *before* BigBear revealed that its internal controls over its financial reporting were inadequate, despite previously claiming that it had remediated all the prior material weaknesses in its internal controls.

13. BigBear's controlling shareholder, AE, and BigBear's executives (at AE's direction) did not maintain a robust accounting department capable of producing reliable financial reports. To the contrary, AE and BigBear's executives so prioritized minimizing and cutting costs that the Company's accounting department was consistently understaffed and subject to constant personnel turnover. Moreover, most of the accounting personnel were too inexperienced to work on external financial reporting, and when positions in the accounting department had to be filled, Defendant Peffer filled roles with her personal connections, notwithstanding their lack of accounting skills and experience. As FE 1, FE 2, FE 3, and FE 4 all explained, the accounting department was consistently under-resourced with inadequate numbers of personnel, few of whom had the technical accounting skills to work on financial reporting. Instead, it was constantly beset with deficiencies in internal controls and lacked sufficient resources to remediate and maintain internal controls over financial reporting. The under-resourced accounting team was by design. AE maintained strategic control through its representation on the Board, and FE 4 confirmed that AE was heavily involved in operational decisions.

14. Against this backdrop, BigBear disclosed in its 2022 10-K, filed March 31, 2023, that the Company found "our disclosure controls and procedures were not effective due to material weaknesses in internal controls over financial reporting related to the inadequate segregation of duties, revenue recognition, and ineffective IT General Controls." These material

weaknesses "exist[ed] … as of December 31, 2022." As BigBear's 10-K explained, "A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements could occur but will not be prevented or detected on a timely basis."

15.    The 2022 10-K stated that BigBear would make efforts to remediate these material weaknesses, and they "will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of these material weaknesses will be completed prior to the end of fiscal year 2023."

16.    On March 15, 2024, BigBear filed its 10-K for 2023, in which the Company declared, "**The material weaknesses are considered remediated**" because "**[a]s of December 31, 2023, management completed the implementation of our remediation efforts of the material weaknesses**," and "**management has concluded, through testing, that these controls are operating effectively**." The 10-K elaborated on the details of these efforts:

> Remediation efforts included enhancing our control design and demonstrating our ability to effectively operate our controls. **Management enhanced the risk assessment process and design of internal control over financial reporting by implementing mitigating controls over segregation of duties; enhancing the documentation and timing of the Company's analysis and conclusions on revenue recognition from contracts with customers at time of award or modification; implementing or enhancing IT General Controls; developing oversight policies; and increased monitoring and oversight activities across all business process areas**.

17.    And further, the 10-K hypothetically cautioned that "**if, in the future, the Company is unable to maintain effective internal control over financial reporting** pursuant to Section 404(a), the Company may not be able to assess whether its internal controls over financial reporting are effective, which may subject it to financial reporting misstatements and

- 7 -

adverse regulatory consequences and could harm investor confidence and the market price of the Company's shares of common stock."

18.    But these statements in the 2023 Form 10-K identified above were false and misleading when made. And Defendants Long and Peffer, who made these statements by signing the 10-K and attached SOX[2] certifications, were reckless in doing so because they knew, or recklessly disregarded the truth, that the accounting department was still remediating significant deficiencies in internal controls over financial reporting into 2024. FE 4's focus was on remediating material weaknesses, and FE 4 said internal control remediation efforts continued (contrary to Defendants' representations in the 2023 Form 10-K) *beyond* December 31, 2023 and into 2024. As FE 4 explained, the accounting department was a "dumpster fire" with too few and too inexperienced staff. FEs 1 2, 3, and 4 confirmed the accounting department was understaffed (both in numbers of personnel and skill) and plagued with frequent personnel turnover. BigBear lacked its own internal team to handle external financial reporting, said FE 4. Instead, the Company relied heavily on Ernst & Young ("EY") to handle technical accounting matters and the preparation of 10-Qs and 10-Ks, and MorganFranklin to handle the internal audit function. While these external advisors were involved in core financial reporting functions, however, material weaknesses over internal reporting still existed. Due to the Company's lack of experienced accounting staff, FE 4 was one of few people each responsible for a significant number of internal controls, which made it difficult for the accounting team to operate effectively. FE 4 attended

---

[2] Under Section 302 of the Sarbanes-Oxley ("SOX") Act of 2002, the CEO and CFO of publicly traded companies must certify the accuracy and completeness of the company's financial statements and the effectiveness of its internal controls (or that they have otherwise disclosed to the auditors and audit committee any significant deficiencies in internal controls or fraud involving management or employees).

quarterly Board and Audit Committee meetings in 2023 and 2024, and confirmed that the CEO, CFO, and Board were fully informed of all internal control deficiencies and remediation efforts through quarterly presentations during 2024 given by MorganFranklin.

19.     In each of the quarterly financial reports filed on Form 10-Q for the first three quarters of 2024, Defendants Long and Peffer again misleadingly warned investors of the hypothetical risk that it could be possible that BigBear might not in the future maintain effective internal controls over financial reporting and misleadingly affirmed that there were "no changes in our internal controls over financial reporting during the three months ended [March 31,2024; June 30, 2024; September 30, 2024] that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

20.     These statements were materially misleading when made, and Long and Peffer either knowingly or recklessly made them. No material changes in the Company's internal controls over financial reporting had occurred because the material weaknesses in BigBear's internal controls had never been remedied—not because they remained effective. And the hypothetically disclaimed risk was not hypothetical—it had already materialized. FE 2, who worked as a Staff Accountant at BigBear from February 2024 to April 2025, described organizational instability in the accounting team, including a period of several months before June 2024 in which they and other accounting staff had no direct manager. FE 2 also described a recurring inappropriate accounting practice at the Company in which revenue adjustments were booked retroactively (as if they had occurred in prior periods)—even months after the fact— when reconciliations revealed entries had been missed or misclassified. FE 2 often requested written confirmation when asked to perform these backdated entries because of their discomfort with altering closed accounting periods. Not until a new controller was hired in June 2024 did

management begin implementing formal processes for approvals, workflows, and correcting accounting issues such as general ledger coding.

21.    AE had long planned to exit BigBear by the end of 2024. AE reduced its ownership from 75% at the beginning of 2024 to 32.4% by December 2024 and continued to sell its BigBear stock in 2025. Despite reducing its ownership to less than 200,000 shares by April 2025, AE has maintained internal control and influence over business decisions through its five representatives on the Board.

22.    AE knew that BigBear had never remedied the material weaknesses in its internal controls over financial reporting. No fewer than five AE Partners sat on the Board at any time, including Jeffrey Hart, Paul Fulchino, Pamela Braden (Audit Committee member), Kirk Konert, and Peter Cannito. And AE Partner Kevin McAleenan joined BigBear as President of the Company in March 2024 after BigBear acquired Pangiam, of which he had been CEO, and in which AE owned a controlling interest. Per FE 4, AE was heavily involved in operational decisions, financial oversight, and strategy. And the Board received MorganFranklin's SOX-mandated quarterly presentations about the state of internal controls over financial reporting and related remediation efforts.

23.    At the start of March 2024, AE held approximately 165 million shares of BigBear stock, accounting for approximately 75.2% of BigBear's equity. Across seven transactions in March 2024, AE sold 22,777,874 shares for $58,389,864 in proceeds, reducing AE's equity stake to 64.8%.

24.    As revealed in BigBear's 2025 10-K filed March 25, 2025, BigBear adopted a new Insider Trading Policy effective September 11, 2024, which explicitly **excluded** "AE Industrial

Partners, L.P. and any of its affiliated investment funds" from the list of persons subject to the Policy.

25.    AE then sold 19,219,860 shares across 24 transactions in October and November 2024 for proceeds of $39,668,780, leaving AE with approximately 50.6% equity. In December 2024, AE sold 60,908,433 shares for $196,249,539 in proceeds, reducing its equity stake to 32.4%.

26.    On December 19, 2024, BigBear announced on Form 8-K that it had entered into "separate, privately negotiated exchange agreements" with holders of the 2026 Convertible Notes accounting for "approximately $182.3 million in aggregate principal amount of the "2026 Notes," by which the debt due on the 2026 Notes is instead due in 2029. These new 2029 Notes would be secured (instead of unsecured) and pay higher interest rates under certain conditions. As FE 4, a senior member of the accounting department, explained, renegotiating a debt instrument like the 2026 Convertible Notes would have required the Company to look at the existing debt, the new agreements, and the prior accounting treatment of the existing debt.

27.    The shares constituting AE's remaining 32.4% equity stake in BigBear were acquired through BigBear's acquisition of Pangiam and subject to a lock-up provision prohibiting their sale until March 2025. Across eleven transactions in March 2025, AE sold 36,551,743 shares for proceeds of $147,532,236.[3] In the span of a year, AE liquidated its 75% stake in BigBear, reaping over $450 million in proceeds, all while fully knowing the breadth of internal control deficiencies that permeated BigBear's financial reporting.

---

[3] In a final post-Class Period transaction, AE sold AE sold 27,430,402 shares for $78,450,950 on April 8, 2025.

28.     One day after AE sold 2,314,872 shares for $8,240,944.32, on March 18, 2025, BigBear disclosed, pre-market in a Form 8-K and NT 10-K, that the Company required "additional time to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2024" because the Company and its independent auditor, Grant Thornton LLP, had reevaluated the accounting presentation of embedded conversion option in the 2026 Convertible Notes and "require[d] additional time to complete valuations necessary to determine the impact on the Company's historical financial statements...." This change would "result in the Company's restatement of its audited financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and 2024."

29.     On this news, BigBear's common stock declined $0.52 per share, or 14.9%, from $3.49 per share at close on March 17, 2025 to $2.97 per share at close on March 18, 2025.

30.     BigBear filed its belated 10-K for 2024 a week later, after market close on March 25, 2025, restating financials back through year-end 2022 and disclosing that it had "identified a material weakness in its internal controls over financial reporting which failed to prevent or detect the identified misstatements requiring misstatement." The Company described this new material weakness:

> **We have not consistently executed our technical accounting review policies** … at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions.

Accordingly, "the Company's management concluded that … **the Company's internal control over financial reporting was not effective as of December 31, 2024, and in prior periods**." In other words, BigBear admitted it did not review the accounting treatment for the 2026 Convertible

Notes as it was required to do so, and material deficiencies in internal controls over financial reporting persisted.

31.     The Company's restatement revealed that it had been significantly understating the costs of the debt from the 2026 Convertible Notes. For Year-End 2022, Amortization of Debt Issuance Costs and Discount was $11,958,000—more than 500% greater than previously reported. For Year-End 2023, that same figure was $12,965,000—more than 600% greater than previously reported—and Interest Expense and Net Loss were both more than $10 million greater than previously reported. And for each of the quarterly results reported in 2024, restated Amortization of Debt Issuance Costs and Discount similarly increased 500-600% over previously reported figures, and restated Interest Expense and Net Loss increased $8.7 million and $8.3 million, respectively, over the previously reported figures for the first nine months of 2024.

32.     On this news, BigBear's common stock declined $0.45 per share, or 12.8%, from $3.51 per share at close on March 25, 2021 to $3.19 per share at close on March 26, 2021, and $3.06 per share at close on March 27, 2021.

33.     This action seeks to recover for (1) the losses suffered by Lead Plaintiffs and members of the Class due to Defendants' false or misleading statements and omissions during the Class Period, and the resulting precipitous decline in the price of BigBear common stock upon the revelation of the truth, and (2) AE's sales of BigBear stock at artificially inflated prices and while in possession of material nonpublic information.

**JURISDICTION AND VENUE**

34.     This Complaint asserts claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder,

including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). It also asserts claims under 20A of the Exchange Act, 15 U.S.C. §78t-1(a).

35.    This Court has jurisdiction over the subject matter of this action under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

36.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), (c), and (d) because BigBear is headquartered in this District.

37.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of national securities exchanges.

## PARTIES

38.    Lead Plaintiffs Ning Sun and Yan Zeng, sisters-in-law and residents of Hong Kong and Walnut, California, respectively, purchased BigBear common stock during the Class Period and were damaged thereby. *See* ECF No. 34-2.

39.    Additional Named Plaintiff Nicholas Horman, resident of Glen Cove, New York, purchased BigBear common stock during the Class Period and was damaged thereby.

40.    Defendant BigBear.ai Holdings, Inc. is a Delaware corporation with principal executive offices located at 7950 Jones Branch Drive 1st Floor North Tower, McLean, VA 22102. BigBear common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "BBAI."

41.    Defendant Louis R. Brothers was the first CEO of BigBear as a publicly traded company following the SPAC merger and continued as CEO until October 2022. Defendant Brothers signed BigBear's 2021 10-K on March 31, 2022. He also signed the Company's 1Q22 10-Q on May 12, 2022, and the 2Q22 10-Q on August 12, 2022.

42.     Defendant Joshua Kinley was the CFO of BigBear as a publicly traded company following the SPAC merger and continued as CFO until June 2022. Defendant Kinley signed BigBear's 2021 10-K on March 31, 2022. He also signed the Company's 1Q22 10-Q on May 12, 2022.

43.     Defendant Amanda Long replaced Brothers as CEO of BigBear in October 2022 and remained CEO until January 2025. Defendant Long signed BigBear's 2022 10-K on March 31, 2023; the 2023 10-K on March 15, 2024; the 1Q23 10-Q on May 15, 2023; the 2Q23 10-Q on August 10, 2023; the 3Q23 10-Q on November 9, 2023; the 1Q24 10-Q on May 10, 2024; the 2Q24 10-Q on August 9, 2024; and the 3Q24 10-Q on November 7, 2024.

44.     Defendant Julie A. Peffer replaced Kinley as CFO of BigBear in June 2022 and served as CFO until June 2025. Defendant Peffer signed BigBear's 2022 10-K on March 31, 2023; the 2023 10-K on March 15, 2024; the 2024 10-K on March 25, 2025; the 1Q23 10-Q on May 15, 2023; the 2Q23 10-Q on August 10, 2023; the 3Q23 10-Q on November 9, 2023; the 1Q24 10-Q on May 10, 2024; the 2Q24 10-Q on August 9, 2024; and the 3Q24 10-Q on November 7, 2024.

45.     Defendant Sean Ricker served as Corporate Controller of BigBear when it became a publicly traded company following the SPAC merger and continued in that role until August 2022. He thereafter assumed the role of CAO through June 2025, when he became interim CFO following Peffer's exit from the Company. Defendant Ricker signed BigBear's 2021 10-K on March 31, 2022; the 2022 10-K on March 31, 2023; the 2023 10-K on March 15, 2024; and the 2024 10-K on March 25, 2025.

46.     Defendant AE Industrial Partners, L.P. is a private equity firm established as a Delaware limited partnership with principle executive offices located at 6700 Broken Sound

Parkway NW, Boca Raton, FL 33487. AE's general partner is AeroEquity LP, LLC, whose managing members are Michael Greene and David Rowe—the co-CEOs of AE. According to the 8-K filed December 13, 2021 by BigBear, AE held 83.5% of BigBear's equity following the SPAC merger. AE maintained an overwhelming controlling stake in BigBear until liquidating its position in December 2024 and March 2025. AE touts on its website that it realized and exited its investment in BigBear on December 31, 2024.

47.    AE owns and controls numerous subsidiary entities through which it charged BigBear consulting fees, held shares of BigBear stock, exercised control over BigBear: AE Industrial Operating Partners, LLC, BBAI Ultimate Holdings, LLC, AE BBRED GP, LLC, and AE BBAI Aggregator, LP and AE Industrial Partners Fund II, L.P., AE Industrial Partners Fund II-A, L.P., AE Industrial Partners Fund II-B, L.P., and AE Industrial Partners Fund II GP, LP. No fewer than five directors on BigBear's Board are partners of AE (and were throughout the Class Period). Pamela Braden, Peter Cannito, Paul Fulchino are and were Operating Partners at AE and have been members of BigBear's Board since it became a publicly traded company in December 2021. Jeffrey Hart, who has been a member of BigBear's Board of Directors since it became a publicly traded company in December 2021, was a Principal at AE through December 2023, at which point he became Partner. Kirk Konert has been a Partner of AE and a member of BigBear's Board of Directors since it became a publicly traded company in December 2021. Hart, Konert, Braden, Cannito, and Fulchino were all signatories of the Company's 2021, 2022, 2023, and 2024 10-Ks.

48.    Defendants Brothers, Kinley, Long, Peffer, and Ricker are also referred to as the "Individual Defendants." BigBear, the Individual Defendants, and AE are referred to collectively as "Defendants."

49.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of BigBear, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers, and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading before its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material nonpublic information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

### FORMER BIGBEAR EMPLOYEES

50.     **Former Employee 1 ("FE 1")** served as HR Generalist, Lead at BigBear from August 2022 through April 2024. In late 2023, FE 1 was promoted to oversee BigBear's Human Resources Information System and payroll systems after the departure of their supervisor, the HR technology manager. FE 1 observed significant dysfunction and instability across the organization. FE 1 described widespread concern among employees over Defendant Long's erratic decision-making. FE 1 cited rumors suggesting that Long was making impulsive and disruptive decisions, leading to a lack of confidence in leadership. One frequent complaint involved the Company laying off employees while simultaneously acquiring new companies and absorbing new personnel. These moves reportedly caused confusion and frustration among staff, particularly when layoffs and hiring occurred in the same departments.

51.     FE 1 said there was instability in the accounting department, which FE 1 understood to be small and under-resourced. FE 1 was aware of multiple rounds of layoffs in the accounting department. FE 1 explained that critical roles in accounting were frequently left unfilled, and staffing decisions often seemed misaligned with actual business needs.

52.     **Former Employee 2 ("FE 2")** served as a Staff Accountant at BigBear from February 2024 through April 2025. FE 2 joined BigBear through the Company's acquisition of Pangiam. FE 2 served as an accounts payable (A/P) specialist. FE 2's role involved coding and processing invoices, making payments, and performing reconciliations.

53.     FE 2 described the post-acquisition environment as "a shit show." FE 2 said BigBear's accounting team experienced organizational instability and significant turnover during their tenure. Three employees left right before FE 2 joined, and another three departed after BigBear's acquisition of Pangiam. FE 2 also observed that the merger of Pangiam into BigBear led to persistent accounting issues, including incorrect carryover of balances and data from the migration of Pangiam's systems. The first month of post-migration data was inaccurate, said FE 2, and this was promptly brought to the attention of superiors, including Defendant Ricker, but cleanup of these discrepancies was pushed off to Q4 of 2024. FE said these and other accounting discrepancies were left unaddressed for months due to the lack of internal resources and proper oversight.

54.     Moreover, for a period of several months before June 2024, FE 2 and other accounting staff had no direct manager. FE 2's direct manager left BigBear shortly after the Pangiam acquisition, and no direct manager was hired until June 2024, when Katie Thompson came in as a new controller. In the interim, Defendant Ricker was technically FE 2's direct supervisor, but Ricker was unavailable nine times out of ten when questions around

discrepancies arose, and he otherwise provided little guidance. Ricker generally told accounting department staff to "continue doing things the way they had been done" until the Company could hire adequate support. When the A/P team flagged problems early on (including the inaccuracy of post-migration data), Ricker and Thompson did not act on them.

55.     FE 2 also described a recurring accounting practice at the Company in which revenue adjustments were booked retroactively (as if they had occurred in prior periods)—even months after the fact—when reconciliations revealed entries had been missed or misclassified. FE 2 often requested written confirmation when asked to perform these backdated entries because FE 2 was not comfortable with altering closed accounting periods. To FE 2's understanding, this practice deviated from proper accounting procedures. But not until Katie Thompson was hired in June 2024 did management begin implementing formal processes for approvals, workflows, and correcting accounting issues such as general ledger coding. Some of these processes began to be implemented in or around August 2024.

56.     **Former Employee 3 ("FE 3")** served as Financial Controller at BigBear from January 2021 to February 2023. Before the SPAC merger, FE 3 worked under the supervision of Defendant Sean Ricker. FE 3 said that auditor Grant Thornton was deeply involved in auditing and supporting the IPO process, to the extent that the relationship between Grant Thornton and company leadership (especially Ricker) appeared unusually close. Frequent communications and in-person visits led FE 3 to believe the lines between auditor and client became blurred.

57.     While FE 3's focus was operational and subsidiary-level finance, decisions surrounding high-level accounting treatments during FE 3's tenure were made exclusively by Ricker and Peffer. FE 3 further explained that Ricker maintained tight control over disclosure and financial statements such that nothing went public without his review.

58.    FE 3 described Peffer's tenure as "transformative and problematic." She aggressively restructured the finance department by removing experienced personnel (including eventually FE 3) and replacing them with individuals from her personnel network, who often lacked adequate qualifications and experience in government contracting. FE 3 said this created an environment vulnerable to errors, misjudgments, and even intentional accounting misstatements. When FE 3 was terminated, FE 3 was told that it was because their role was being "consolidated"—a justification FE 3 said was implausible given the size and complexity of their responsibilities. FE 3 instead attributes their exit from BigBear to a clash of values. FE 3 insisted on adherence to internal controls, regulatory compliance, and ethical financial practices (which FE 3 said were of heightened importance given BigBear's status as a publicly traded government contractor), while the finance leadership's preferred style consisted of "improvised accounting methods and opaque decision making." This made FE 3 "not a good fit."

59.    **Former Employee 4 ("FE 4")** served as senior member of the accounting department at BigBear in 2023 and 2024. FE 4 was deeply involved in BigBear's internal financial matters.

60.    FE 4 explained that BigBear did not have an internal team to handle external financial reporting. BigBear's internal finance team was small: the CFO (Peffer), CAO (Ricker), FE 4, and a "very small and relatively inexperienced support staff." FE 4 said this created a dynamic in which external advisors were deeply involved in core financial reporting functions because of the lack of in-house expertise.  The Company relied heavily on Ernst & Young on a contract basis to handle technical accounting matters and the preparation of 10-Qs and 10-Ks. BigBear's internal audit function was handled by another consulting firm, MorganFranklin. FE 4 said that there was frequent turnover in BigBear's finance team.

61.     When FE 4 arrived at BigBear in 2023, the Company had a large number of material weaknesses in its internal controls over financial reporting. FE 4 explained that deficiencies in documentation and testing often accumulated into material weaknesses. Before FE 4's tenure at BigBear, the Company had disclosed several material weaknesses. FE 4 explained that due to the Company's lack of accounting staff, a very small number of people were each responsible for a significant number of internal controls, which made it difficult for the accounting team to operate effectively.  FE 4 said their focus was on remediating material weaknesses, and this work continued into 2024. FE estimated that they spent half of their time working with MorganFranklin on the internal audit function. FE 4 described the workplace at BigBear as a "dumpster fire": it was a "top-heavy" leadership structure, atop an under-resourced accounting/finance team, made up of too few and inexperienced staff.

62.     FE 4 attended quarterly Board and Audit Committee meetings, which occurred in person in BigBear's Maryland office. In addition to FE 4, the Audit Committee included, amongst others, the CFO, CAO, CEO, internal and external auditors, three directors. The Audit Committee met about two weeks before SEC filings, including quarter Qs and the annual 10-K. Audit Committee members, along with internal and external auditors, were required to attend these meetings. The Audit Committee was apprised and informed during 2024 that BigBear continued to have material weaknesses over internal controls. The internal auditor, MorganFranklin, made quarterly presentations to the Audit Committee and the whole Board. As required by the Sarbanes-Oxley Act, MorganFranklin presented the status of all internal control deficiencies and remediation efforts at these quarterly Audit Committee and Board meetings, which were also attended by the CEO (Long) and CFO (Peffer).

63.     FE 4 noted that AE, a private equity firm, held roughly half of the Board seats and therefore had "Board control." FE 4 described AE's Board members as being deeply involved in financial oversight and strategy of the Company.

64.     FE 4 described the Board as generally vocal—especially so in Board and Audit Committee meetings, but Directors also communicated with leadership through less formal channels. Quarterly Board and Audit Committee meetings frequently focused on the Company's financial health. Board members received high-level financial reports, including income statements, balance sheets, cash flow data, and key metrics; the Audit Committee, however, received more detailed financial and accounting information, and Committee meetings often addressed internal controls, debt obligations, and other financial reporting concerns. FE 4 described Board and Audit Committee meetings as often contentious, especially around the subjects of the Company's cash flow and financial performance. FE 4 observed that the conflict stemmed from competing priorities between the AE-affiliated faction of directors and the rest of the Board.

65.     FE 4 worked on the preparation for the 2024 year-end financial report filed on SEC form 10-K and described the timeline related to doing so. BigBear had a December 31 end to the fiscal year, so financials were typically finalized in January, followed by a prolonged audit. Because (1) BigBear lacked an internal SEC reporting team, (2) the accounting team was so small, and (3) the number of control issues was so large, this audit process was "brutal," according to FE 4.

66.     FE 4 did not recall BigBear evaluating or reassessing the accounting treatment for the 2026 Convertible Notes and their embedded conversion option during his tenure at the Company. In FE 4's experience, renegotiating a debt instrument like the 2026 convertible notes

would have required the Company to look at the existing debt, the new agreements, and the prior accounting treatment of the existing debt.

## BACKGROUND

**The Origin of BigBear.ai and the 2026 Convertible Notes**

67.    Headquartered in McLean, Virginia, BigBear describes itself as "an AI-driven technology solutions company" that provides both software and services to its customers. BigBear "provide[s] technology that helps organizations operationalize AI: making faster, more informed decisions by analyzing complex data and providing actionable insights in areas of critical national security, defense and related markets." Many of BigBear's customers use BigBear's resources to supplement their own in-house technical and operational staff.

68.    BigBear is the product of numerous transactions driven by Defendant AE, a private equity firm that targets investments in defense and government services, commercial aerospace, specialty industrial, power and utility services, and business aviation. AE initially merged three of its portfolio companies into the privately held predecessor entity, BigBear.ai, before then causing publicly traded Defendant BigBear to acquire two additional AE portfolio companies.

69.    In December 2020, NuWave Solutions merged with BigBear, Inc., which then merged with PCI Strategic Management in February 2021 to form BigBear.ai. AE held its ownership of this privately held, legacy BigBear.ai in an investment vehicle named BBAI Ultimate Holdings, LLC. Defendant Brothers, who had been the CEO of NuWave, was appointed as CEO of the new company, legacy BigBear.ai.

70.    On June 4, 2021, legacy BigBear.ai and its affiliates entered into a merger agreement with GigCapital, a SPAC formed by GigAcquisitions4, LLC and its controlling founder and CEO, Avi Katz. The merger agreement included a minimum closing condition that

- 23 -

GigCapital have at least $350 million in cash. GigCapital had raised substantial funds through its IPO but needed to raise additional funds to satisfy the $350 million closing condition. GigCapital and AE initially sought to raise $150 million towards this threshold through a PIPE (private investment in public equity). But prospective investors balked at GigCapital and AE's $2.11 billion valuation of legacy BigBear.ai. So AE and GigCapital pivoted to instead raising additional funds through a convertible note offering. Convertible notes are debt instruments that pay the holder interest and can be converted into equity at a future date. GigCapital first proposed a $150 million convertible note offering complemented by a $50 million PIPE, but had to drop the PIPE entirely and increased the size of the convertible note offering to $200 million to sufficiently fund the merger.

71.    On December 7, 2021, legacy BigBear.ai merged with GigCapital, and the resulting entity was renamed BigBear.ai Holdings, Inc. (the present publicly traded company and Defendant). Defendant BigBear represented in its SEC filings that the consolidated financial statements of the combined entity largely represent the continuation of the consolidated financial statements of legacy BigBear.ai.

72.    Also on December 7, 2021, and in connection with the SPAC merger, BigBear issued the 2026 Convertible Notes in the aggregate principal of $200.0 million. As explained in the Company's December 13, 2021 8-K announcing the close of the SPAC merger,

> The Convertible Notes mature on December 15, 2026 and, not including any interest payments that are settled with the issuance of shares, are convertible into 17,391,304 shares of the Company's common stock, par value $0.0001 per share ("Company Common Stock"), plus certain interest payments described below, at a conversion price of $11.50 per share. However, if the average of the per share volume-weighted average price as displayed under the heading "Bloomberg VWAP" in respect of the period from the scheduled open of trading until the scheduled close of trading of the primary trading session on such trading day up to and including the final closing print (the "Daily VWAP") during the 30 consecutive trading days immediately preceding the date that is 180 days after the closing of the

Business Combination (the "Reset Date") is less than $10.00, the conversion rate for the Convertible Notes shall be replaced, with effect from the Reset Date, by the lower of (a) $1,000 divided by 115% of the average of the Daily VWAP during the 30 consecutive trading days immediately preceding the Reset Date and (b) 102.2495. As a result, the conversion price of the Convertible Notes could be reset to as low as $9.78.

73.     So while the 2026 Convertible Notes were convertible initially into 17,391,304 shares of Common Stock, triggering the Conversion Rate Reset provision would increase the number of shares to be issued in case of conversion to up to 23,058,494.

74.     According to BigBear's 2021 10-K filed March 31, 2022, AE owned 83.5% of BigBear's outstanding equity following close of the SPAC merger.

75.     BigBear.ai went public on December 7, 2021 by completing a merger with a SPAC, GigCapital4, Inc., and the resulting entity was renamed BigBear.ai Holdings, Inc. (the present company and defendant). Shortly after becoming a publicly traded company, BigBear acquired ProModel Corporation on April 11, 2022. And finally, on March 1, 2024, BigBear announced it had acquired Pangiam Intermediate Holdings, LLC. Each of these companies was majority owned and controlled by AE, which, according to the Company's 2021 10-K filed March 31, 2022, owned 83.5% of outstanding equity following close of the SPAC merger.

76.     On April 11, 2022, BigBear's subsidiary BigBear.ai, LLC acquired ProModel Corporation (another AE portfolio company).

77.     On March 1, 2024, BigBear announced that it acquired Pangiam Intermediate Holdings, LLC (another AE portfolio company) for an estimated $70 million in an all-stock transaction. AE created Pangiam in 2020 through the acquisitions and combination of Linkware, LLC and Pangiam's predecessor company, PRE, LLC. Kevin McAleenan, previously CEO of Pangiam, was announced as President of the combined company, and AE stated that McAleenan would play a critical role in leading the combined business. At the time of this merger, AE

controlled both Pangiam and BigBear. As a result, Kirk Konert (managing partner at AE) and Jeffrey Hart (partner at AE) stated that they recused themselves from BigBear Board deliberations regarding the merger agreement and related transactions.

**BigBear Fails to Bifurcate the Conversion Option from the Debt Obligation in Accounting for 2026 Convertible Notes**

78.    BigBear confirmed in its first post-merger SEC filing (the 2021 Annual Report on form 10-K, filed March 31, 2022) that its "consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America." The single source of GAAP is the FASB's ASC.

79.    BigBear's 2026 Convertible Notes are a form of convertible debt, or a hybrid instrument, consisting of two parts: (1) a host contract (the unsecured debt that matures on December 15, 2026 and pays interest), and (2) an embedded derivative (the conversion option). ASC 815-15, which governs the accounting of derivatives, controls whether a company must account for an embedded derivative separately from its host contract (a process known as "bifurcation") or treat the instrument as single unit in accordance with other GAAP. Under ASC 815-15-55-218, an issuer must bifurcate an embedded derivative from its host contract if (1) the economic characteristics and risks of the embedded derivative are not clearly and closely related to the economic characteristics of the host contract; (2) the hybrid instrument is not remeasured at fair value under otherwise applicable GAAP with changes in fair value reported in earnings as they occur; and (3) a separate freestanding instrument with the same terms as the embedded derivative would (a) meet the definition of a derivative and (b) not qualify for a "derivative scope exception."

80.    Scope exceptions under ASC 815 allow issuers of hybrid convertible debt instruments that are "equity-like" in their nature to account for the instrument as a single unit,

thus avoiding bifurcating an embedded derivative from its host contract and the associated complexities with derivative accounting. One particularly burdensome aspect of bifurcation is that a company must redetermine the fair value of the embedded derivative liability at each reporting period. This process often involves costly and complex valuation methods and introduces a degree of variability to the company's financial reporting, which would reflect changes in the embedded derivative's fair values caused by changes in the company's stock price, interest rates, and time to maturity.

81.     To avoid imposing the burden of derivative accounting overbroadly, the FASB provides several scope exceptions in ASC 815-10-15. One such scope exception is ASC 815-10-15-74(a), often called the "equity classification scope exception," which requires that a qualifying embedded derivative be indexed to the entity's own stock and meet certain equity classification conditions. ASC 815-40-15 provides that a contract is indexed to an entity's own equity only if that contract involves the exchange of a fixed amount of cash for a fixed number of shares (a structure referred to as "fixed-for-fixed"). But if the exercise price or settlement amount varies based on external factors (*i.e.*, stock price movements), the instrument is not indexed to the entity's own stock and is therefore ineligible for a derivative scope exception under ASC 815-10-15-74(a).

82.     In Accounting for the 2026 Convertible Notes, BigBear deemed the embedded conversion option "fixed-for-fixed," *i.e.*, a fixed number of shares for a fixed price, and therefore eligible for the equity classification scope exception outlined in ASC 815-10-15-74(a). This was a reckless misapplication of the accounting standards, and therefore a clear violation of GAAP. The 2026 Convertible Note's conversion option was clearly not for a fixed number of shares for a fixed price as both the number of shares and price would change based on the market price of

BigBear's common stock. Based on a clear-cut application of ASC 815-10-15-74(a), BigBear incorrectly accounted for the 2026 Convertible Notes.

83.     Indeed, ASC 815-40-15-7D makes clear that "[a]n instrument's strike price or the number of shares used to calculate the settlement amount **are not fixed if its terms provide for any potential adjustment**, regardless of the probability of such adjustment(s) or whether such adjustments are in the entity's control." (emphasis added). And the 2026 Convertible Notes' Conversion Rate Reset provision indisputably meant that the 2026 Notes' conversion option was *not* indexed to BigBear's stock, because **the number of shares and strike price for those shares were subject to adjustment**. Therefore, under GAAP, the embedded conversion option had to be bifurcated from the 2026 Convertible Notes.

84.     BigBear admitted its material error on March 18, 2025, disclosing in a Form 8-K that the Company would need to restate financials because it "had previously concluded that the embedded conversion option did not need to be accounted for as a derivative separate from the 2026 Notes, which was consistently reflected across all of the Company's historical financial statements."

85.     Although determining the proper accounting treatment for the 2026 Convertible Notes was straightforward, the implications of properly bifurcating the embedded conversion option as a derivative were complicated and costly. As explained, BigBear would have had to redetermine the fair value of the embedded derivative liability at each reporting period. This process often involves costly and complex valuation methods and introduces a degree of variability to the company's financial reporting, which would reflect changes in the embedded derivative's fair values caused by changes in the company's stock price, interest rates, and time to maturity. Properly analyzing, calculating, and documenting this derivative liability every

quarter would have required that BigBear hire and retain a deep and experienced in-house accounting team. But this was something Defendants intentionally avoided. In fact, as recounted by former employees of BigBear, Defendants maintained a consistently understaffed and under-resourced accounting team—described as "a shitshow" and "a dumpster fire"—that was incapable of reliably handling even basic accounting functions.

**Defendants' Myopic Focus on Reducing and Minimizing Costs and Dysfunctional Leadership Translated Into a Dumpster Fire of an Accounting/Finance Team**

86.     BigBear's controlling shareholder, AE, and BigBear's executives (at AE's direction) never intended to maintain a robust accounting department capable of producing complex, reliable financial reports. To the contrary, AE and BigBear's executives so prioritized minimizing and cutting costs that the Company's accounting department was consistently understaffed and subject to constant personnel turnover. Moreover, most of the accounting personnel were too inexperienced to work on external financial reporting, and when positions in the accounting department had to be filled, CFO Peffer filled roles with personal connections, notwithstanding their lack of accounting skills and experience.

87.     FE 3 described Peffer' leadership (from her start in June 2022 through FE 3's departure in February 2023), as "transformative and problematic." Peffer aggressively restructured the finance department by removing experienced personnel (including, eventually, FE 3) and replacing them with individuals from her personal network, who typically lacked adequate qualifications and experience in government contracting. This, said FE 3, created an environment vulnerable to errors, misjudgments, and even intentional accounting misstatements. And when FE 3 was terminated, FE 3 was told that their role was being "consolidated," but this was not believable, said FE 3, because of the size and complexity of FE 3's accounting and finance responsibilities.

- 29 -

88.    FE 1, 2, 3, and 4 all confirmed that the accounting and finance team continued as an understaffed, resource-strapped, and overall deficient operation through (at least) year-end 2024. As FE 1, FE 2, FE 3, and FE 4 all explained, the accounting department was consistently under-resourced with inadequate numbers of personnel, few of whom had the technical accounting skills to work on financial reporting. Instead, it was constantly beset with deficiencies in internal controls and lacked sufficient resources to remediate and maintain internal controls over financial reporting. The under-resourced accounting team was by design. BigBear lacked an internal team to handle external financial reporting and instead relied on a consulting arrangement with EY to handle technical projects like quarterly Qs and annual Ks. According to FE 4, AE was heavily involved in Company strategy and decision-making.

89.    FE 2 described the use of inappropriate accounting practices, like retroactively booking revenue adjustments as if they had occurred in prior periods when reconciliations revealed erroneous entries. And FE 2 detailed persistent accounting issues like incorrect account balances and data resulting from the problematic migration of Pangiam's systems to BigBear after the acquisition. And when these issues were brought to Ricker's attention in the second quarter of 2024, he pushed off addressing the issue for months because BigBear's controller position was vacant and Ricker (who technically became FE 2's manager in that interim) was too busy to deal with them. Ricker told FE 2 and other staff accountants to "continue doing things the way they had been done" until the Company could hire adequate support.

90.    Essentially, BigBear's accounting and finance team was so consistently deficient that the Company has never maintained effective internal control over financial reporting; it has always been beset by material weaknesses in those internal controls. As BigBear's 10-K explained, "A material weakness is a deficiency, or combination of deficiencies, in internal

control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements could occur but will not be prevented or detected on a timely basis."

91.    The Company has twice admitted that its internal control over financial reporting were deficient.  First, in its 2022 10-K, filed March 31, 2023, the Company disclosed that it had determined "our disclosure controls and procedures were not effective due to material weaknesses in internal controls over financial reporting related to the inadequate segregation of duties, revenue recognition, and ineffective IT General Controls." These material weaknesses "exist[ed] … as of December 31, 2022." The Company continued to report its material weakness in internal controls over financial reporting throughout 2023. Second, on March 25, 2025, BigBear disclosed that it had "identified a material weakness in its internal controls over financial reporting which failed to prevent or detect the identified misstatements requiring misstatement." Moreover, "the Company's management concluded that … the Company's internal control over financial reporting was not effective as of December 31, 2024, and in prior periods."

92.    In the interim period, on March 15, 2024, BigBear deemed the earlier disclosed material weakness "remediated," as of December 31, 2023, but this was misleading. As the FEs recount, these deficiencies were not remediated. FE 4's primary responsibility was on remediating deficiencies in internal controls over financial reporting, and this work continued well into 2024. To the extent the Company had remediated any deficiencies in internal controls over financial reporting, plenty of new ones emerged unaddressed. As the end-of-class-period disclosure on March 25, 2025 conceded, "the Company's internal control over financial reporting was not effective as of December 31, **and in prior periods**." Indeed, FE 2 and FE 4, whose tenures barely overlapped, and combined spanned July 2023 through April 2025,

described BigBear's accounting and finance teams as "a shit show" and "a dumpster fire," respectively.

### AE Closely Controlled BigBear Through the Company's Board of Directors and Operated BigBear in AE's Own Interests

93.    AE formed BigBear out of several of its own portfolio companies and then dumped two additional portfolio companies into BigBear even after it went public. AE maintained complete control over BigBear. According to BigBear's 2021 10-K filed March 31, 2022, AE owned 83.5% of outstanding equity following close of the SPAC merger. AE maintained in excess of 50% of the Company's equity until December 2024. In the year 2024, AE reduced its ownership from 75% in 1Q24 to 32.4% in December 2024, selling over 61 million shares in November and December 2024 alone. Most recently, AE sold 27 million shares for $2.86 each in a single transaction on April 8, 2025. This brought AE's total indirect ownership down to just under 200,000 shares.

94.    AE also excepted itself from standard company policies, like BigBear's Insider Trading Policy and Related Party Transactions Policy. The Insider Trading Policy adopted September 11, 2024, said "The Company may also determine that other persons should be subject to this Policy, such as contractors or consultants who have access to material nonpublic information **in each case other than AE Industrial Partners, L.P. and any of its affiliated investment funds**. And for "Covered Persons," the policy "applies to any entities that you influence or control, including any corporations, partnerships or trusts **in each case other than AE Industrial Partners, L.P. and any of its affiliated investment funds**." As explained in BigBear's 2022 10-K, Related party transactions are subject to the Audit Committee's review, which "may only approve those transactions that are in, or are not inconsistent with, our best interests and those of [BigBear's] stockholders, as the Audit Committee determines in good

faith." But the Company's Related Party Transactions Policy predetermines that "any related party transaction with [AE] and/or any of their respective subsidiaries that is contemplated by [various contracts between AE entities and BigBear] are pre-approved by our Audit Committee."

95.    AE also maintained control at the Board level. No fewer than five AE Partners sat on the Board at any time, including Jeffrey Hart, Paul Fulchino, Pamela Braden (Audit Committee member), Kirk Konert, and Peter Cannito. And AE Partner Kevin McAleenan joined BigBear as President of the Company in March 2024 after BigBear acquired Pangiam, of which he had been CEO, and in which AE owned a controlling interest. McAleenan joined the Board too when he replaced Long as CEO and Director in January 2025.

96.    AE's trades show that it planned to exit BigBear by the end of 2024. At the start of March 2024, AE held approximately 165 million shares of BigBear stock, accounting for approximately 75.2% of BigBear's equity. Before March 2024, AE had only sold a relatively small amount of BigBear common stock in May 2023.

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 05/30/23 | Common Stock | $2.44 | -361,096 | -$881,074.24 |
| 05/26/23 | Common Stock | $2.42 | -749,909 | -$1,814,779.78 |
| 05/25/23 | Common Stock | $2.45 | -960,012 | -$2,352,029.40 |
| 05/24/23 | Common Stock | $2.41 | -339,060 | -$817,134.60 |
| 05/23/23 | Common Stock | $2.48 | -502,294 | -$1,245,689.12 |
| 05/22/23 | Common Stock | $2.40 | -189,232 | -$454,156.80 |
| 05/19/23 | Common Stock | $2.42 | -148,229 | -$358,714.18 |
| 05/18/23 | Common Stock | $2.43 | -1,428,937 | -$3,472,316.91 |
| 05/17/23 | Common Stock | $2.43 | -1,252,677 | -$3,044,005.11 |
| 05/16/23 | Common Stock | $2.41 | -669,318 | -$1,613,056.38 |
| 05/15/23 | Common Stock | $2.48 | -1,939,414 | -$4,809,746.72 |
| 05/12/23 | Common Stock | $2.43 | -618,067 | -$1,501,902.81 |
| 05/11/23 | Common Stock | $2.51 | -98,909 | -$248,261.59 |
| 05/10/23 | Common Stock | $2.66 | -1,604,426 | -$4,267,773.16 |

97.      But starting in March of 2024, AE began to take steps towards exiting its investment in BigBear. Across seven transactions in March 2024, AE sold 22,777,874 shares for $58,389,847.2 in proceeds, reducing AE's equity stake to 64.8%.

| Date | Security | Price | Units | Value |
|------|----------|-------|-------|-------|
| 03/15/24 | Common Stock | $2.47 | -2,461,867 | -$6,080,811.49 |
| 03/14/24 | Common Stock | $2.55 | -8,009,447 | -$20,424,089.85 |
| 03/13/24 | Common Stock | $2.53 | -4,777,012 | -$12,085,840.36 |
| 03/12/24 | Common Stock | $2.44 | -139,527 | -$340,445.88 |
| 03/11/24 | Common Stock | $2.47 | -1,832,678 | -$4,526,714.66 |
| 03/08/24 | Common Stock | $2.58 | -2,857,343 | -$7,371,944.94 |
| 03/08/24 | Common Stock | $2.80 | -2,700,000 | -$7,560,000.00 |

98.      On May 7, 2024, AE entered into a 10b5-1 trading plan to sell additional shares of BigBear (though the plan's parameters did not trigger sales until December 2024). AE could enter into a 10b5-1 trading plan because, as explained by AE's own Form 4 filed for six sales in December 2024, "Kirk Michael Konert and Jeffrey Hart serve as Partners of AE Industrial Partners, LP. AE Industrial Partners and each AE Party may, therefore, be considered a director of the issuer by deputization."

99.      But despite acknowledging that AE is a director of BigBear, BigBear conspicuously failed to disclose AE's 10b5-1 plan in its 1Q24 10-Q filed May 10, 2024 (or any subsequent 10-Q or 10-K), in violation of updated Regulation S-K reporting requirements effective April 8, 2024. Item 408 of Regulation S-K requires disclosure when, "during the registrant's last fiscal quarter …, any director or officer … adopted or terminated …[a]ny contract, instruction, or written plan for the purchase or sale of securities of the registrant intended to satisfy the affirmative defense conditions of Rule 10b5-1(c)" and requires "a description of the material terms, other than terms with respect to the price at which the individual executive the Rule 10b5-1 trading arrangement … is authorized to trade." 17 C.F.R. § 229.408. BigBear demonstrated it understood this new disclosure requirement by disclosing

the terms of 10b5-1 plans entered into by Defendant Long on May 23, 2024 and Defendant Ricker on September 11, 2024 in the Company's August 9, 2024 and November 7, 2024 10-Qs, respectively.

100.    As revealed in BigBear's 2025 10-K filed March 25, 2025, BigBear adopted a new Insider Trading Policy effective September 11, 2024, which excluded "AE Industrial Partners, L.P. and any of its affiliated investment funds" from the list of persons subject to the Policy.

101.    AE then sold 19,219,860 shares across 24 transactions in October and November 2024 for proceeds of $45,749,547.45, leaving AE with approximately 50.6% equity. In December 2024, AE sold 60,908,433 shares for $196,249,693.22 in proceeds, reducing its equity stake to 32.4%.[4]

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 12/26/24 | Common Stock | $4.15 | -6,075,697 | -$25,214,142.55 |
| 12/19/24 | Common Stock | $3.63 | -153,250 | -$556,297.50 |
| 12/18/24 | Common Stock | $3.59 | -2,860,843 | -$10,270,426.37 |
| 12/17/24 | Common Stock | $3.11 | -2,574,535 | -$8,006,803.85 |
| 12/16/24 | Common Stock | $2.89 | -5,313,090 | -$15,354,830.10 |
| 12/13/24 | Common Stock | $2.52 | -2,851,290 | -$7,185,250.80 |
| 12/12/24 | Common Stock | $2.69 | -3,763,502 | -$10,123,820.38 |
| 12/11/24 | Common Stock | $2.94 | -3,248,938 | -$9,551,877.72 |
| 12/10/24 | Common Stock | $3.27 | -4,146,835 | -$13,560,150.45 |
| 12/09/24 | Common Stock | $3.93 | -9,003,424 | -$35,383,456.32 |
| 12/06/24 | Common Stock | $3.39 | -6,328,238 | -$21,452,726.82 |
| 12/05/24 | Common Stock | $2.96 | -4,775,664 | -$14,135,965.44 |
| 12/04/24 | Common Stock | $2.68 | -3,528,158 | -$9,455,463.44 |
| 12/03/24 | Common Stock | $2.61 | -5,245,770 | -$13,691,459.70 |
| 12/02/24 | Common Stock | $2.22 | -1,039,199 | -$2,307,021.78 |
| 11/29/24 | Common Stock | $2.27 | -1,094,452 | -$2,484,406.04 |
| 11/27/24 | Common Stock | $2.12 | -867,877 | -$1,839,899.24 |
| 11/26/24 | Common Stock | $2.10 | -1,075,687 | -$2,258,942.70 |

[4] 39,446,644 of the 60.9 million shares AE sold in December 2024 (transactions on December 5, 2024, December 6, 2024, December 9, 2024, December 18, 2024, December 19, 2024, and December 26, 2024) were sold pursuant to a 10b5-1 plan adopted May 7, 2024.

| 11/25/24 | Common Stock | $2.40 | -2,181,844 | -$5,236,425.60 |
| 11/22/24 | Common Stock | $2.42 | -2,382,851 | -$5,766,499.42 |
| 11/21/24 | Common Stock | $2.21 | -1,821,619 | -$4,025,777.99 |
| 11/20/24 | Common Stock | $2.04 | -795,530 | -$1,622,881.20 |
| 11/19/24 | Common Stock | $1.80 | -97,785 | -$176,013.00 |
| 11/18/24 | Common Stock | $1.79 | -388,023 | -$694,561.17 |
| 11/15/24 | Common Stock | $1.76 | -7,600 | -$13,376.00 |
| 11/14/24 | Common Stock | $1.77 | -251,700 | -$445,509.00 |
| 11/13/24 | Common Stock | $1.79 | -205,817 | -$368,412.43 |
| 11/12/24 | Common Stock | $1.84 | -751,880 | -$1,383,459.20 |
| 11/11/24 | Common Stock | $1.91 | -3,201,746 | -$6,115,334.86 |
| 11/08/24 | Common Stock | $1.76 | -1,175,196 | -$2,068,344.96 |
| 11/07/24 | Common Stock | $1.76 | -65,047 | -$114,482.72 |
| 11/05/24 | Common Stock | $1.77 | -859,317 | -$1,520,991.09 |
| 10/30/24 | Common Stock | $1.75 | -16,523 | -$28,915.25 |
| 10/29/24 | Common Stock | $1.77 | -562,400 | -$995,448.00 |
| 10/21/24 | Common Stock | $1.75 | -5,500 | -$9,625.00 |
| 10/18/24 | Common Stock | $1.77 | -389,534 | -$689,475.18 |
| 10/17/24 | Common Stock | $1.75 | -10,075 | -$17,631.25 |
| 10/16/24 | Common Stock | $1.76 | -439,040 | -$772,710.40 |
| 10/15/24 | Common Stock | $1.78 | -572,817 | -$1,019,614.26 |

102.    On December 19, 2024, BigBear announced on Form 8-K that it had entered into "separate, privately negotiated exchange agreements" with holders of the 2026 Convertible Notes accounting for "approximately $182.3 million in aggregate principal amount of the "2026 Notes," by which the debt due on the 2026 Notes is instead due in 2029. These new 2029 Notes would be secured (instead of unsecured) and pay higher interest rates under certain conditions.

103.    Most of AE's remaining shares had been acquired through BigBear's acquisition of Pangiam and were therefore subject to a lock-up provision prohibiting their sale until March 2025. Across 11 transactions in March 2025, AE sold 36,551,743 shares for proceeds of $147,532,223.10.[5]

---

[5] In a final post-Class Period transaction, AE sold AE sold 27,430,402 shares for $78,450,949.72 on April 8, 2025.

| Date | Security | Price | Units | Value |
|------|----------|-------|-------|-------|
| 03/26/25 | Common Stock | $3.51 | -5,150 | -$18,076.50 |
| 03/17/25 | Common Stock | $3.56 | -2,314,872 | -$8,240,944.32 |
| 03/14/25 | Common Stock | $3.49 | -5,216,361 | -$18,205,099.89 |
| 03/13/25 | Common Stock | $3.28 | -1,707,837 | -$5,601,705.36 |
| 03/12/25 | Common Stock | $3.33 | -3,629,108 | -$12,084,929.64 |
| 03/10/25 | Common Stock | $3.36 | -3,137,293 | -$10,541,304.48 |
| 03/07/25 | Common Stock | $3.35 | -2,660,841 | -$8,913,817.35 |
| 03/06/25 | Common Stock | $4.31 | -4,149,559 | -$17,884,599.29 |
| 03/05/25 | Common Stock | $4.61 | -4,089,824 | -$18,854,088.64 |
| 03/04/25 | Common Stock | $4.65 | -4,624,979 | -$21,506,152.35 |
| 03/03/25 | Common Stock | $5.12 | -5,015,919 | -$25,681,505.28 |

104.    In the span of a year, AE liquidated its 75% stake (as of March 1, 2024) in BigBear and reaped over $450 million, in proceeds all while fully knowing the breadth of internal control deficiencies that permeated BigBear's financial reporting, and going back to December 2024 (when BigBear renegotiated with the lion's share of the holders of the 2026 Convertible Notes) knowing the impending need to restate Company financials going back to Year-End 2022. Indeed, AE made its last substantial March sale just three days before disclosing the forthcoming restatement.

**Defendants Misled Investors About the State of BigBear's Internal Controls**

105.    Throughout the Class Period, Defendants Repeatedly affirmed in SOX certifications their implementation and review of internal controls over financial reporting, as well as the effectiveness of those internal controls.

106.    And after conceding deficiencies in internal controls over financial reporting significant enough to constitute a material weakness in March 2023, Defendants declared, "**The material weaknesses are considered remediated**" on March 25, 2024 because "**[a]s of December 31, 2023, management completed the implementation of our remediation efforts**

of the material weaknesses," and "**management has concluded, through testing, that these controls are operating effectively**." But this was untrue. As detailed by FEs 1, 2, 3, and 4, pervasive deficiencies in internal controls over financial reporting persisted into 2024, and new ones constantly arose.

107.    Further, BigBear hypothetically warned investors that "**if, in the future, the Company is unable to maintain effective internal control over financial reporting pursuant to Section 404(a), the Company may not be able to assess whether its internal controls over financial reporting are effective, which may subject it to financial reporting misstatements** and adverse regulatory consequences and could harm investor confidence and the market price of the Company's shares of common stock." But this risk disclaimer misled as it failed to reveal to investors that BigBear's then current internal controls over its financial statements were ineffective.

108.    And though Defendants learned in December 2024 that by renegotiating the 2026 Convertible Notes, the Company would have to disclose its GAAP violations going back to its first financial report as a publicly traded company, Defendants delayed disclosing the truth long enough for AE to exit its investment in BigBear before the stock drop that would result.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

109.    Defendants knew, or recklessly disregarded, that the following statements to BigBear investors were materially false and misleading and/or omitted to state material facts necessary to make those statements not misleading.

### A.    Year-End Annual Report for 2021

110.    The Class Period starts on March 31, 2022, when BigBear filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the

year ended December 31, 2021 (the "2021 10-K"). Defendants Brothers, Kinley, and Ricker signed the 2021 10-K.

111.    In providing a summary of the Company's significant accounting policies, the 2021 10-K stated, in relevant part, that "*[t]he consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")*." Further, in its consolidated balance sheet, the Company reported a *"[t]otal stockholders' equity (deficit)" figure of $122,368,000 as of December 31, 2021*.

112.    The 10-K also acknowledged and affirmed BigBear's adoption of an update to the ASC issued by the FASB in August 2020 that specifically modified the rules governing how to account for the 2026 Convertible Notes:

> In August 2020, the FASB issued ASU 2020-06, Debt with Conversion and Other Options (Subtopic 470-20) and Derivatives and Hedging – Contracts in Entity's Own Equity (Subtopic 815-40): Accounting for Convertible Instruments and Contracts in an Entity's Own Equity ("ASU 2020-06"), which, amongst other provisions, simplifies the guidance on the issuer's accounting for convertible instruments and the derivative scope exception for contracts in an entity's own equity such that fewer conversion features will require separate recognition and modifies how particular convertible instruments and certain contracts that may be settled in cash or shares impact the diluted earnings per share computation. While ASU 2020-06 is required for fiscal years beginning after December 15, 2021 (including interim periods), early adoption is permitted for fiscal years (including interim periods) beginning after December 15, 2020. ***The Company early adopted ASU 2020-06 as of January 1, 2021 on the modified retrospective basis, which requires the cumulative effect of applying the standard to be recognized at the date of initial application. The Company concluded that there is no impact to its consolidated financial statements from adopting this guidance on January 1, 2021.***

113.    Appended to the 2021 10-K as exhibits 31.1, 31.2, 32.1, and 32.2 were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Brothers and Kinley, attesting that "*[t]he information contained in the [2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company*."

- 39 -

114.    The italicized statements referenced above in ¶¶111-113 were materially false misleading and omitted to disclose material facts when made because the Company had incorrectly accounted for the conversion option embedded in the 2026 Convertible Notes going back to BigBear's first report as a public company (the 2021 10-K) by failing to bifurcate the conversion option from the 2026 Notes and to separately account for the option as an embedded derivative. This necessitated the Company's restatement of year-end 2021 "Total Stockholders' Equity (Deficit)" from $122,368,000 (as incorrectly stated in the 2021 10-K) to $159,688,000 in BigBear's 2024 10-K filed March 25, 2025.

| Period | Item | Previously Reported Figure | Restated Figure from 2024 10-K |
|--------|------|---------------------------|-------------------------------|
| As of December 31, 2021 | Total Stockholders' Equity (Deficit) | $122,368,000 | $159,688,000 |

115.    The need to restate this figure means that BigBear's consolidated financial statements were **not** prepared in accordance with GAAP, and the 2021 10-K did **not** fairly present the financial condition and results of operations of the Company in all material respects.

116.    Furthermore, it was misleading for BigBear, Brothers, and Kinley to tout the Company having been early adopters of a recent FASB accounting standards update to the rules governing the accounting treatment of the 2026 Convertible Notes and state that "there is no impact to its consolidated financial statements from adopting this guidance on January 1, 2021" when BigBear's accounting for the 2026 Notes violated both the old and new accounting standards. Indeed, BigBear admitted in its March 18, 2025 8-K and NT 10-K and March 25, 2025 10-K that it had not properly accounted for the 2026 Convertible Notes by deeming the conversion option exempt from bifurcation under a derivative scope exception.

117.    BigBear's 2026 Convertible Notes are a form of convertible debt, or a hybrid instrument, consisting of two parts: (1) a host contract (the unsecured debt that matures on

December 15, 2026 and pays interest), and (2) an embedded derivative (the conversion option). ASC 815-15, which governs the accounting of derivatives, controls whether a company must account for an embedded derivative separately from its host contract (a process known as "bifurcation") or treat the instrument as single unit in accordance with other GAAP. Under ASC 815-15-55-218, an issuer must bifurcate an embedded derivative from its host contract if, among other things, a separate freestanding instrument with the same terms as the embedded derivative (1) would meet the definition of a derivative and (2) would not qualify for a "derivative scope exception."

118.    Scope exceptions under ASC 815 allow issuers of hybrid convertible debt instruments that are "equity-like" in their nature to account for the instrument as a single unit, thus avoiding bifurcating an embedded derivative from its host contract and the associated complexities with derivative accounting. The amendments in the August 2020 accounting standards update, in BigBear's own words, "simplifie[d] the guidance on the issuer's accounting for convertible instruments and the derivative scope exception for contracts in an entity's own equity such that fewer conversion features will require separate recognition" In other words, the amendments brought more convertible debt instruments within the derivative scope exception; they did not subject more convertible debt instruments to ASC 815's bifurcation requirements.

119.    The scope exception that Defendants recklessly applied to the 2026 Notes was ASC 815-10-15-74(a), often called the "equity classification scope exception," which requires that a qualifying embedded derivative be indexed to the entity's own stock and meet certain equity classification conditions. ASC 815-40-15 provides that a contract is indexed to an entity's own equity only if that contract involves the exchange of a fixed amount of cash for a fixed number of shares (a structure referred to as "fixed-for-fixed"). But if the exercise price or settlement amount

varies based on external factors (*i.e.*, stock price movements), the instrument is not indexed to the entity's own stock and is therefore ineligible for a derivative scope exception under ASC 815-10-15-74(a). Indeed, ASC 815-40-15-7D makes clear that "[a]n instrument's strike price or the number of shares used to calculate the settlement amount **are not fixed if its terms provide for any potential adjustment**, regardless of the probability of such adjustment(s) or whether such adjustments are in the entity's control." (emphasis added).

120.    The 2026 Convertible Notes' Conversion Rate Reset provision indisputably meant that the 2026 Notes' conversion option was not indexed to BigBear's stock, because the number of shares and strike price for those shares were subject to adjustment. But BigBear erroneously deemed the conversion option fixed-for-fixed—in clear violation of GAAP—and therefore excepted from the need to be separately accounted for as a derivative instrument. And the August 2020 updated accounting standards only made clearer the error of this accounting treatment.

121.    Choosing the right accounting treatment was a straightforward analysis, but Defendants had a motive to avoid bifurcation. Properly bifurcating the embedded conversion option as a derivative would require complicated and costly accounting work. As explained, BigBear would have had to redetermine the fair value of the embedded derivative liability at each reporting period. This process often involves costly and complex valuation methods and introduces a degree of variability to the company's financial reporting, which would reflect changes in the embedded derivative's fair values caused by changes in the company's stock price, interest rates, and time to maturity. Properly analyzing, calculating, and documenting this derivative liability every quarter would have required that BigBear hire and retain a deep and

experienced in-house accounting team. AE and BigBear sought to maintain a barebones (and deficient) accounting and finance team.

122.    Moreover, Defendant Ricker so closely guarded the Company's disclosure and financial statements in BigBear's early days as a publicly traded company that he approved of or recklessly disregarded the GAAP violation. According to FE 3, who worked directly under Defendant Ricker before and through the SPAC merger, Ricker maintained tight control over disclosure and financial statements such that nothing went public without his review. Moreover, Ricker had an unusually close relationship with auditor Grant Thornton, who was deeply involved in supporting the SPAC merger.

**B.  Year-End Annual Report for 2022**

123.    During a conference call to discuss the fourth quarter and full year 2022 earnings on March 13, 2023, Defendant Peffer disclosed that BigBear had identified a material weakness in internal controls over financial reporting, but misleadingly reassured that a thorough review of Company financial statements, turned up no material errors in consolidated financial statements:

> I wanted to provide additional context of the material weakness that we described in our earnings release related to our internal IT controls. While ***we have completed a thorough review of our financial statements and have not identified any material errors in our financial results or our consolidated financial statements***. We have discovered gaps in our internal control processes and IT-related controls that, in aggregate, resulted in a material weakness in our internal controls. We are addressing the issues, including enhancing segregation of duties, implementing additional IT general controls and increased monitoring and oversight activities. We are implementing a comprehensive remediation plan in coordination with our auditor and expect the remediation work to be completed this year.

124.    On March 31, 2023, BigBear filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2022 (the "2022 10-K"). Defendants Long, Peffer, and Ricker signed the 2022 10-K. The 2022 10-K

falsely stated, "*We prepare our consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP")*.".

125.    The 2022 10-K falsely reported an *amortization of debt issuance costs figure of $2,302,000, a "[d]eferred income tax (benefit) expense" figure of $1,757,000, and a "[n]et increase (decrease) in fair value of derivatives" figure of $1,591,000* on its consolidated statement of cash flows for the year ended December 31, 2022.

126.    The 2022 10-K also misleadingly stated,

Notwithstanding the identified material weaknesses**, management, including our principal executive officer and principal financial officer, believes the consolidated financial statements included in this Annual Report on Form 10-K fairly represent in all material respects our financial condition, results of operations and cash flows at and for the periods presented in accordance with U.S. GAAP**.

127.    Appended to the 2022 10-K as exhibits 31.1, 31.2, 32.1, and 32.2 were signed certifications pursuant to SOX by Defendants Long and Peffer, attesting that "*[t]he information contained in the [2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company*."

128.    The italicized statements referenced above in ¶¶123-127 were materially false misleading and omitted to disclose material facts when made because, as explained in ¶¶117-122 (and admitted by the Company in its March 18, 2025 8-K and NT 10-K and March 25, 2025 10-K), the Company had incorrectly accounted for the conversion option embedded in the 2026 Convertible Notes going back to BigBear's first report as a public company (the 2021 10-K) by failing to bifurcate the conversion option from the 2026 Notes and to separately account for the option as an embedded derivative. Moreover, as admitted by the Company on March 25, 2025, BigBear "[has] not consistently executed [its] technical accounting review policies." This necessitated the Company's restatement of figures from year-end 2022:

| Period | Item | Previously Reported Figure | Restated Figure from 2024 10-K |
|---|---|---|---|
| Year Ended December 31, 2022 | Amortization of Debt Issuance Costs and Discount | $2,302,000 | $11,958,000 |
| | Deferred Income Tax (Benefit) Expense | $1,757,000 | $1,924,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $1,591,000 | $21,387,000 |

129.    The need to restate these figures means that BigBear's consolidated financial statements were **not** prepared in accordance with GAAP, the 2022 10-K did **not** fairly present the financial condition and results of operations of the Company in all material respects, and management either did not conduct a thorough review of BigBear's financial statements (which would have revealed material errors in the Company's consolidated financial statements) or misrepresented their findings.

### C.  Quarterly Reports for Fiscal Year 2023

130.    BigBear filed its quarterly financial and operational results for Q1 2023 on May 15, 2023 ("the Q1 2023 10-Q"), for Q2 2023 on August 10, 2023 ("the Q2 2023 10-Q"), and for Q3 2023 on November 9, 2023 ("the Q3 2023 10-Q"). Each 10-Q was signed by Defendants Long and Peffer. Each 10-Q said, "*We prepared these accompanying unaudited consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information*[.]"

131.    Appended to each 10-Q as exhibits 31.1, 31.2, 32.1, and 32.2 were signed certifications pursuant to SOX by Defendants Long and Peffer, attesting that *"[t]he information*

*contained in the [10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company.*"

132.    In the Q1 2023 10-Q, BigBear reported *a derivative liabilities figure of $25,469,000 on its consolidated balance sheet as of March 31, 2023*. Further, *for the three months ended March 31, 2023, the Company reported an interest expense figure of $3,556,000, a "[n]et increase (decrease) in fair value of derivatives" figure of $10,567,000, and a net loss of $26,214,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $500,000 on its consolidated statement of cash flows*.

133.    In the Q2 2023 10-Q, BigBear reported *a derivative liabilities figure of $44,126,000 on its consolidated balance sheet as of June 30, 2023*. Further, on its consolidated statement of operations, the Company reported *an interest expense figure of $3,560,000 for Q2 2023 and $7,116,000 for the six months ended June 30, 2023, and a net loss of $16,895,000 for Q2 2023 and $43,109,000 for the six months ended June 30, 2023*. Finally, on its consolidated statement of cash flows, BigBear reported *an amortization of debt issuance costs figure of $1,006,000 and a "[n]et increase (decrease) in fair value of derivatives" figure of $13,688,000 for the six months ended June 30, 2023*.

134.    In the Q3 2023 10-Q, BigBear reported *a derivative liabilities figure of $28,467,000 on its consolidated balance sheet as of September 30, 2023*. Further, on its consolidated statement of operations, the Company reported *an interest expense figure of $3,540,000 for Q3 2023 and $10,656,000 for the nine months ended September 30, 2023*, and a *net loss of $39,110,000 for the nine months ended September 30, 2023*. Finally, on its consolidated statement of cash flows, BigBear reported *an amortization of debt issuance costs figure of $1,512,000 for the nine months ended September 30, 2023*.

135.    On March 7, 2024, BigBear issued a press release announcing the Company's Q4 2024 results. The press release reported **an interest expense figure of $3,544,000** and ***a net loss of $21,256,000 for the three months ended December 31, 2023***.

136.    The italicized statements referenced above in ¶¶130-135 were materially false misleading and omitted to disclose material facts when made because, as explained in ¶¶117-122 (and admitted by the Company in its March 18, 2025 8-K and NT 10-K and March 25, 2025 10-K), the Company had incorrectly accounted for the conversion option embedded in the 2026 Convertible Notes going back to BigBear's first report as a public company (the 2021 10-K) by failing to bifurcate the conversion option from the 2026 Notes and to separately account for the option as an embedded derivative. Moreover, as admitted by the Company on March 25, 2025, BigBear "[has] not consistently executed [its] technical accounting review policies." This necessitated the Company's restatement of quarterly figures throughout 2023:

| Period | Item | Previously Reported Figure | Restated Figure from 2024 10-K |
|---|---|---|---|
| As of March 31, 2023 | Derivative Liabilities | $25,469,000 | $28,469,000 |
| Three Months Ended March 31, 2023 | Interest Expense | $3,556,000 | $6,084,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $10,567,000 | $13,012,000 |
| | Net Loss | $26,214,000 | $31,187,000 |
| | Amortization of Debt Issuance Costs and Discount | $500,000 | $3,028,000 |
| As of June 30, 2023 | Derivative Liabilities | $44,126,000 | $46,435,000 |
| Three Months Ended June 30, 2023 | Interest Expense | $3,560,000 | $6,186,000 |
| | Net Loss | $16,895,000 | $18,830,000 |
| Six Months Ended June 30, 2023 | Interest Expense | $7,116,000 | $12,270,000 |
| | Net Loss | $43,109,000 | $50,017,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,006,000 | $6,160,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $13,688,000 | $15,442,000 |
| As of September 30, 2023 | Derivative Liabilities | $28,467,000 | $29,166,000 |
| Three Months Ended September 30, 2023 | Interest Expense | $3,540,000 | $6,267,000 |
| Nine Months Ended September 30, 2023 | Interest Expense | $10,656,000 | $18,537,000 |
| | Net Loss | $39,110,000 | $47,135,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,512,000 | $9,393,000 |
| Three Months Ended December 31, 2023 | Interest Expense | $3,544,000 | $6,340,000 |
| | Net Loss | $21,256,000 | $23,522,000 |

137.    The need to restate these figure means that BigBear's consolidated financial statements were **not** prepared in accordance with GAAP and the 10-Qs for the first three quarters of 2023 did **not** fairly present the financial condition and results of operations of the Company in all material respects.

### D.  Year-End Annual Report for 2023

138.    On March 15, 2024, BigBear filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K"). Defendants Long, Peffer, and Ricker signed the 2023 10-K, which stated, "***We prepare our consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP")***."

139.    In the 2023 10-K, BigBear reported a derivative liabilities figure of $37,862,000 on its consolidated balance sheet as of December 31, 2023. Further, for the year ended December 31, 2023, the Company reported an interest expense figure of $14,200,000 and a net loss of $60,366,000 on its consolidated statement of operations, and an amortization of debt issuance costs figure of $2,018,000, and a "[d]eferred income tax (benefit) expense" figure of $88,000 on its consolidated statement of cash flows.

140.    The 2023 10-K also stated:

Management previously identified and disclosed in our Annual Report, on Form 10-K for the year ended December 31, 2022, as well as in our Quarterly Report on Form 10-Q filed for the quarters ended March 31, 2023, June 30, 2023, and September 30, 2023, material weaknesses in internal controls over financial reporting related to the combination of inadequate segregation of duties, the timeliness of contract award and modification evaluation for proper revenue recognition, and ineffective IT General Controls. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements could occur but will not be prevented or detected on a timely basis.

*As of December 31, 2023, management completed the implementation of our remediation efforts of the material weaknesses.* Remediation efforts included enhancing our control design and demonstrating our ability to effectively operate our controls. *Management enhanced the risk assessment process and design of internal control over financial reporting by implementing mitigating controls over segregation of duties; enhancing the documentation and timing of the Company's analysis and conclusions on revenue recognition from contracts with customers at time of award or modification*; implementing or enhancing IT General Controls; *developing oversight policies; and increased monitoring and oversight activities across all business process areas. The material weaknesses are considered remediated. The applicable remedial controls have operated for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.*

141. Additionally, the 10-K hypothetically cautioned that

*if, in the future, the Company is unable to maintain effective internal control over financial reporting* pursuant to Section 404(a), the Company may not be able to assess whether its internal controls over financial reporting are effective, which may subject it to financial reporting misstatements and adverse regulatory consequences and could harm investor confidence and the market price of the Company's shares of common stock.

142. Appended to the 2023 10-K as exhibits 31.1, 31.2, 32.1, and 32.2 were SOX certifications signed by Defendants Long and Peffer, attesting that (1) *"[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company*," and (2) "*I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors … [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*."

143. The italicized statements referenced above in ¶¶138-142 were materially false misleading and omitted to disclose material facts when made because, as explained in ¶¶117-122 (and admitted by the Company in its March 18, 2025 8-K and NT 10-K and March 25, 2025 10-

K), the Company had incorrectly accounted for the conversion option embedded in the 2026 Convertible Notes going back to BigBear's first report as a public company (the 2021 10-K) by failing to bifurcate the conversion option from the 2026 Notes and to separately account for the option as an embedded derivative. Moreover, as admitted by the Company on March 25, 2025, BigBear "[has] not consistently executed [its] technical accounting review policies." This necessitated the Company's restatement of figures from year-end 2023:

| Period | Item | Previously Reported Figure | Restated Figure from 2024 10-K |
|---|---|---|---|
| As of December 31, 2023 | Derivative Liabilities | $37,862,000 | $38,353,000 |
| Year Ended December 31, 2023 | Interest Expense | $14,200,000 | $24,877,000 |
| | Net Loss | $60,366,000 | $70,657,000 |
| | Amortization of Debt Issuance Costs and Discount | $2,018,000 | $12,695,000 |
| | Deferred Income Tax (Benefit) Expense | $88,000 | $235,000 |

144.    The need to restate these figures means that BigBear's consolidated financial statements were **not** prepared in accordance with GAAP and the 2023 10-K did **not** fairly present the financial condition and results of operations of the Company in all material respects.

145.    As for BigBear's internal controls over financial reporting, the statements of the FEs 1, 2, and 4 show that the Company had **not**, in fact, remediated the material weaknesses in its internal controls, so it remained unable to maintain effective internal control over financial reporting. FE 4, who served as VP and Assistant Controller from July 2023 through May 2024, said that when he arrived in June 2023, BigBear had a large number of material weaknesses in its internal controls over financial reporting. Many of those internal controls related to revenue, said FE 4, but others related more generally to all financial reporting. FE 4 said their focus was

on remediating material weaknesses, which continued through to the May 2024 end of his employment. Due to the lack of accounting staff, FE 4 owned an estimated 90 internal controls— far more than one person could reasonably stay on top of, especially given that FE 4 spent have of their time working with Morgan Franklin on BigBear's internal audit function. FE 4 described the accounting and finance team as a "dumpster fire"—subject to frequent turnover, without enough staff competent to handle technical accounting—and without an internal team to handle external financial reporting.

146.    FE 2, who served as a Staff Accountant from February 2024 (before the 2023 10-Q was filed in March 2024), said the merger of Pangiam into BigBear led to persistent accounting issues, including incorrect carryover of balances and data from the migration of Pangiam's systems. The first month of post-migration data was inaccurate, according to FE 2, which FE 2 and other staff accountants promptly brought to Defendant Ricker's attention. Ricker knew of these discrepancies but did not act on them; their clean-up was pushed off to Q4 2024 because, said FE 2, they and their colleagues lacked a direct manager under Ricker. Ricker was technically FE 2's direct supervisor until Katie Thompson came in as a new controller in June 2024, but he was almost always unavailable and generally told accounting staff to "continue doing things the way they had been done" until the company could hire adequate support. FE 2 also described a recurring problematic accounting practice in which FE 2 and other staff accountants were asked to (and did) book revenue adjustments retroactively (as if they had occurred in prior periods) when reconciliations revealed entries had been missed or misclassified. Not until Katie Thompson was hired in June 2024 did BigBear begin to implement formal processes for approvals, workflows, and correcting accounting issues (such as general ledger coding). On the

whole, FE 2 described BigBear's accounting and finance operations in their tenure as "a shit show."

147.    FE 1, who worked in two different roles in human resources from August 2022 through April 2024, confirmed that the accounting department was small, under-resourced, and saw multiple rounds of layoffs. Moreover, said FE 1, critical roles in accounting were frequently left unfilled, and staffing decisions often seemed misaligned with actual business needs.

148.    In sum, the finance/accounting team at BigBear was incapable of maintaining internal controls over financial reporting, let alone remediating material weaknesses over those internal controls, because it was permeated with deficiencies in substance and process. In particular, FE 4 was still working on remediating material weaknesses in internal controls beyond December 31, 2023, when Defendants deemed the previously identified material weaknesses remediated, and FE 2 described new material deficiencies in internal controls over revenue recognition and oversight in February and March 2023, before the 2023 10-K was filed. BigBear had not remediated its material weakness, and it was materially false and misleading to represent that it had.

### E.  Quarterly Reports for Fiscal Year 2024

149.    BigBear filed its quarterly financial and operational results for Q1 2024 on May 10, 2024 ("the Q1 2024 10-Q"), for Q2 2024 on August 9, 2024 ("the Q2 2024 10-Q"), and for Q3 2024 on November 7, 2024 ("the Q3 2024 10-Q"). Each 10-Q was signed by Defendants Long and Peffer. Each 10-Q said, "***We prepared these accompanying unaudited consolidated financial statements in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information***[.]" And each 10-Q said, "***There were no changes in our internal control over financial reporting during the three months ended March 31, 2024***

*materially affected, or are reasonably likely to materially affect, our internal control over financial reporting*."

150.    Appended to each 10-Q as exhibits 31.1, 31.2, 32.1, and 32.2 were signed certifications pursuant to SOX by Defendants Long and Peffer, attesting that (1) *"[t]he information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company,*" and (2) "*I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors … [a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*."

151.    In the Q1 2024 10-Q, BigBear reported *a derivative liabilities figure of $24,956,000 and a "[t]otal stockholders' equity (deficit)" figure of $108,482,000* on its consolidated balance sheet *as of March 31, 2024*. Further, *for the three months ended March 31, 2024, the Company reported an interest expense figure of $3,555,000 and a net loss of $125,147,000* on its consolidated statement of operations, and *an amortization of debt issuance costs figure of $506,000* on its consolidated statement of cash flows.

152.    In the Q2 2024 10-Q, BigBear reported *a derivative liabilities figure of $17,074,000 and a "[t]otal stockholders' equity (deficit)" figure of $102,756,000* on its consolidated balance sheet *as of June 30, 2024*. Further, on its consolidated statement of operations, the Company reported an *interest expense figure of $3,551,000 for Q2 2024 and $7,106,000 for the six months ended June 30, 2024, a "[n]et increase (decrease) in fair value of derivatives" figure of $7,882,000 for Q2 2024, and a net loss of $11,737,000 for Q2 2024*

*and $136,884,000 for the six months ended June 30, 2024*. Finally, on its consolidated statement of cash flows, BigBear reported *an amortization of debt issuance costs figure of $1,012,000 for the six months ended June 30, 2024*.

153.    In the Q3 2024 10-Q, BigBear reported a *derivative liabilities figure of $15,796,000 and a "[t]otal stockholders' equity (deficit)" figure of $98,433,000* on its consolidated balance sheet *as of September 30, 2024*. Further, *for the nine months ended September 2024, the Company reported an interest expense figure of $10,647,000 and a net loss of $149,060,000* on its consolidated statement of operations, and *an amortization of debt issuance costs figure of $1,517,000 on its consolidated statement of cash flows*.

154.    The italicized statements referenced above in ¶¶149-153 were materially false misleading and omitted to disclose material facts when made because, as explained in ¶¶117-122 (and admitted by the Company in its March 18, 2025 8-K and NT 10-K and March 25, 2025 10-K), the Company had incorrectly accounted for the conversion option embedded in the 2026 Convertible Notes going back to BigBear's first report as a public company (the 2021 10-K) by failing to bifurcate the conversion option from the 2026 Notes and to separately account for the option as an embedded derivative. Moreover, as admitted by the Company on March 25, 2025, BigBear "[has] not consistently executed [its] technical accounting review policies." This necessitated the Company's restatement of quarterly figures throughout 2024:

| Period | Item | Previously Reported Figure | Restated Figure from 2024 10-K |
|--------|------|----------------------------|-------------------------------|
| As of March 31, 2024 | Derivative Liabilities | $24,956,000 | $25,262,000 |
| | Total Stockholders' Equity (Deficit) | $108,482,000 | $143,173,000 |
| Three Months Ended March 31, 2024 | Interest Expense | $3,555,000 | $6,385,000 |
| | Net Loss | $125,147,000 | $127,792,000 |
| | Amortization of Debt Issuance Costs and | $506,000 | $3,336,000 |

| | Discount | | |
|---|---|---|---|
| As of June 30, 2024 | Derivative Liabilities | $17,074,000 | $17,181,000 |
| | Total Stockholders' Equity (Deficit) | $102,756,000 | $134,745,000 |
| Three Months Ended June 30, 2024 | Interest Expense | $3,551,000 | $6,452,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $7,882,000 | $8,081,000 |
| | Net Loss | $11,737,000 | $14,439,000 |
| Six Months Ended June 30, 2024 | Interest Expense | $7,106,000 | $12,837,000 |
| | Net Loss | $136,884,000 | $142,231,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,012,000 | $6,743,000 |
| As of September 30, 2024 | Derivative Liabilities | $15,796,000 | $15,851,000 |
| | Total Stockholders' Equity (Deficit) | $98,433,000 | $127,463,000 |
| Nine Months Ended September 2024 | Interest Expense | $10,647,000 | $19,389,000 |
| | Net Loss | $149,060,000 | $157,366,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,517,000 | $10,259,000 |

155.    The need to restate these figures means that BigBear's consolidated financial statements were **not** prepared in accordance with GAAP and the 2023 10-K did **not** fairly present the financial condition and results of operations of the Company in all material respects.

156.    Furthermore, as explained in ¶¶145-148, BigBear lacked internal control over financial reporting because the finance/accounting team at BigBear so permeated with deficiencies in substance and process that it was incapable of producing reliable and accurate financial reporting.

### THE TRUTH BEGINS TO EMERGE

157.    At 6:04 a.m. on March 18, 2025, BigBear disclosed in a Form 8-K that the Board had concluded the day prior that:

- 56 -

**the Company will need to restate its audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and in 2024 (collectively, the "Prior Financial Statements") and that the Prior Financial Statements, as well as the Company's audited consolidated financial statements for the fiscal year ended December 31, 2021, should no longer be relied upon** for the reasons described below.

In connection with the financial statements to be included in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "2024 Financial Statements") and, as part of the review of the accounting treatment of the Company's convertible secured notes issued in December 2024 (the "2029 Notes"), the Company, together with Grant Thornton LLP ("Grant Thornton"), the Company's independent auditors, reevaluated the accounting presentation of the Company's convertible notes due in 2026 (the "2026 Notes"), specifically, the accounting for the embedded conversion option. The Company and Grant Thornton had previously concluded that the embedded conversion option did not need to be accounted for as a derivative separate from the 2026 Notes, which was consistently reflected across all of the Company's historical financial statements. The Company requires additional time to complete valuations necessary to determine the impact on the Company's historical financial statements and to disclose the impact reflective of this change as of and for the fiscal year ended December 31, 2024. **In addition, the change in position on the interpretation and application of the accounting guidance will also result in the Company's restatement of the Prior Financial Statements.**

158.    And in a Form NT 10-K filed at 6:10 a.m. on March 18, 2025, the Company disclosed that it required "additional time to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2024" because the Company and its independent auditor, Grant Thornton LLP, had reevaluated the accounting presentation of embedded conversion option in the 2026 Convertible Notes and "require[d] additional time to complete valuations necessary to determine the impact on the Company's historical financial statements…." As first stated in the 8-K, this change would "result in the Company's restatement of its audited financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and 2024."

159.    On this news, BigBear's common stock declined $0.52 per share, or 14.9%, from $3.49 per share at close on March 17, 2025 to $2.97 per share at close on March 18, 2025.

- 57 -

160.    On March 25, 2025, at 4:49pm, BigBear filed its belated 10-K for 2024, restating certain financial figures back through year-end 2021:

| Period | Item | Previously Reported Figure | Restated Figure |
|---|---|---|---|
| As of December 31, 2021 | Total Stockholders' Equity (Deficit) | $122,368,000 | $159,688,000 |
| Year Ended December 31, 2022 | Amortization of Debt Issuance Costs and Discount | $2,302,000 | $11,958,000 |
| | Deferred Income Tax (Benefit) Expense | $1,757,000 | $1,924,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $1,591,000 | $21,387,000 |
| As of March 31, 2023 | Derivative Liabilities | $25,469,000 | $28,469,000 |
| Three Months Ended March 31, 2023 | Interest Expense | $3,556,000 | $6,084,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $10,567,000 | $13,012,000 |
| | Net Loss | $26,214,000 | $31,187,000 |
| | Amortization of Debt Issuance Costs and Discount | $500,000 | $3,028,000 |
| As of June 30, 2023 | Derivative Liabilities | $44,126,000 | $46,435,000 |
| Three Months Ended June 30, 2023 | Interest Expense | $3,560,000 | $6,186,000 |
| | Net Loss | $16,895,000 | $18,830,000 |
| Six Months Ended June 30, 2023 | Interest Expense | $7,116,000 | $12,270,000 |
| | Net Loss | $43,109,000 | $50,017,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,006,000 | $6,160,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $13,688,000 | $15,442,000 |
| As of September 30, 2023 | Derivative Liabilities | $28,467,000 | $29,166,000 |
| Three Months Ended September 30, 2023 | Interest Expense | $3,540,000 | $6,267,000 |
| Nine Months Ended September 30, 2023 | Interest Expense | $10,656,000 | $18,537,000 |
| | Net Loss | $39,110,000 | $47,135,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,512,000 | $9,393,000 |

| | | | |
|---|---|---|---|
| Three Months Ended December 31, 2023 | Interest Expense | $3,544,000 | $6,340,000 |
| | Net Loss | $21,256,000 | $23,522,000 |
| As of September 30, 2023 | Derivative Liabilities | $28,467,000 | $29,166,000 |
| Year Ended December 31, 2023 | Interest Expense | $14,200,000 | $24,877,000 |
| | Net Loss | $60,366,000 | $70,657,000 |
| | Amortization of Debt Issuance Costs and Discount | $2,018,000 | $12,695,000 |
| | Deferred Income Tax (Benefit) Expense | $88,000 | $235,000 |
| As of March 31, 2024 | Derivative Liabilities | $24,956,000 | $25,262,000 |
| | Total Stockholders' Equity (Deficit) | $108,482,000 | $143,173,000 |
| Three Months Ended March 31, 2024 | Interest Expense | $3,555,000 | $6,385,000 |
| | Net Loss | $125,147,000 | $127,792,000 |
| | Amortization of Debt Issuance Costs and Discount | $506,000 | $3,336,000 |
| As of June 30, 2024 | Derivative Liabilities | $17,074,000 | $17,181,000 |
| | Total Stockholders' Equity (Deficit) | $102,756,000 | $134,745,000 |
| Three Months Ended June 30, 2024 | Interest Expense | $3,551,000 | $6,452,000 |
| | Net Increase (Decrease) in Fair Value of Derivatives | $7,882,000 | $8,081,000 |
| | Net Loss | $11,737,000 | $14,439,000 |
| Six Months Ended June 30, 2024 | Interest Expense | $7,106,000 | $12,837,000 |
| | Net Loss | $136,884,000 | $142,231,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,012,000 | $6,743,000 |
| As of September 30, 2024 | Derivative Liabilities | $15,796,000 | $15,851,000 |
| | Total Stockholders' Equity (Deficit) | $98,433,000 | $127,463,000 |
| Nine Months Ended September 2024 | Interest Expense | $10,647,000 | $19,389,000 |
| | Net Loss | $149,060,000 | $157,366,000 |
| | Amortization of Debt Issuance Costs and Discount | $1,517,000 | $10,259,000 |

161.    Furthermore, the belated 10-K disclosed that BigBear had "identified a material weakness in its internal controls over financial reporting which failed to prevent or detect the

identified misstatements requiring misstatement." "In connection with the Company's evaluation of internal control over financial reporting for the year ended December 31, 2024, the following material weakness was identified:"

> **We have not consistently executed our technical accounting review policies**, inclusive of the application of certain interpretations subject to significant judgement or differences in interpretation, at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions.

162.    The 10-K said that the material weakness described above "**did result in a material misstatement to the consolidated financial statements as of and for the years ended December 31, 2023, and December 31, 2022, and as of and for the interim quarterly reports during the years ended December 31, 2024 and 2023 presented in this Annual Report on Form 10-K and labeled as restated**." Indeed, as reflected in the restated financials, the Company had been significantly underreporting the cost of issuing the debt through 2026 Convertible Notes since year-end 2022 and continuing through the third quarter of 2024. Restated amortization of debt issuance costs were 500-600% larger than previously reported.

163.    Furthermore, said the 10-K,

> the Company's management concluded that **due to the material weakness in the Company's internal control over financial reporting, the Company's internal control over financial reporting was not effective as of December 31, 2024, and in prior periods**. In addition, as a result of the material weakness, our principal executive officer and principal financial offer concluded that our disclosure controls and procedures were not effective as of December 31, 2024.

164.    On this news, BigBear's common stock declined $0.45 per share, or 12.8%, from $3.51 per share at close on March 25, 2021 to $3.19 per share at close on March 26, 2021, and $3.06 per share at close on March 27, 2021.

**ADDITIONAL EVIDENCE OF DEFENDANTS' SCIENTER**

165.    At all relevant times, Defendants acted with scienter. Numerous facts detailed herein support that Defendants either had actual knowledge of the material facts they omitted to disclose, and which contradicted their false and misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions. The allegations herein, considered holistically, support a strong inference of scienter. BigBear has the scienter of its management-level employees, including each of the Individual Defendants. The following subsections further bolster the indicia of scienter set out in the above allegations and should not be construed to either summarize or replace the indicia of scienter alleged above.

**A.  The Clear Nature of the Accounting Rule Violated in Accounting for the 2026 Convertible Notes Evidences Defendants' State of Mind**

166.    The very nature of the decision to label the embedded conversion option in the 2026 Convertible Notes as "fixed-for-fixed" and eligible for the equity classification exception under ASC 815 demonstrates the scienter of Defendants BigBear, Brothers, Kinley, Ricker, and AE.

167.    Under ASC 815-15-55-218, the default rule provided for issuers to comply with GAAP in accounting for hybrid instruments like the 2026 Convertible Notes is to "bifurcate an embedded derivative from its host contract" unless one of the listed exceptions applies. In accounting for the 2026 Convertible Notes, BigBear deemed the embedded conversion option "fixed-for-fixed," *i.e.*, a fixed number of shares for a fixed price, and therefore eligible for the equity classification scope exception outlined in ASC 815-10-15-74(a).

168.    But this was obviously wrong because the exercise price and number of shares issued for the embedded conversion option in the 2026 Notes was **based on external factors and subject to adjustment**. Defendants showed their understanding of these potential

adjustments by clearly explaining them in BigBear's SEC filings, beginning with the 2021 10-K:

> Our main exposure to market risk relates to changes in the value of our common stock or other instruments that are tied to our common stock including derivative liabilities and convertible debt…Additionally, **our convertible debt contains certain reset provisions that are triggered based on the value of our common stock and volume of shares traded during the reset period. If the reset provision is triggered, the number of shares to be issued in the event of a conversion would increase from 17,391,304 shares to 23,058,494 shares.** Refer to Note N - Written Put Options and Note I - Debt in the notes to our consolidated financial statements in Item 9 on this Annual Report on Form 10-K for further information.

169.    The "convertible debt" described above referred to the 2026 Convertible Notes. BigBear's 2021 10-K explained that the conversion price of the Notes "is subject to adjustments, including but not limited to, a conversion rate Reset (as defined in the Indenture) 180 days after December 7, 2021 should certain daily volume-weighted average price thresholds be met." In particular, the 2026 Convertible Notes had "an initial conversion rate of 86.9565 shares of Common Stock per $1,000 principal amount of 2026 Convertible Notes (subject to adjustment up to 102.2495 per $1,000 principal amount of 2026 Convertible Notes, and further adjustment up to 23,058,494 in the event of a Make-Whole Fundamental Change and maximum downward adjustment to $9.775)." Defendants understood that the embedded conversion option was not a fixed number of shares for a fixed price.

170.    Indeed, ASC 815-40-15-7D provides a brightline rule: "An instrument's strike price or the number of shares used to calculate the settlement amount are **not fixed** if its terms provide for **any potential adjustment**, regardless of the probability of such adjustment(s) or whether such adjustments are in the entity's control." (emphasis added). BigBear's own SEC filings show the Company, Brothers, Kinley, Ricker and AE knew before March 31, 2022 that

the conversion option in the 2026 Convertible Notes needed to be bifurcated under GAAP. It was a straightforward decision that did not involve discretionary judgment. Simply reviewing the parameters of the Notes shows that the "adjustments" flagged in ASC 815-40-15-7D are present. Thus, the nature of the decision that there was no potential adjustment was at least a reckless misapplication of accounting standards and clear violation of GAAP.

171.    By improperly deeming the conversion option subject to the "fixed-for-fixed" scope exception, Defendants BigBear, Brothers, Kinley, Ricker, and AE were able to avoid the more complicated and costly accounting analyses that would have otherwise been required every quarter. Properly bifurcating the conversion option would have required BigBear to redetermine the fair value of the embedded derivative liability at each reporting period. It led to key financial metrics being misstated including the cost of the debt and as a result, misrepresented the Company's overall financial health.

## B. The Deficiencies in BigBear's Accounting and Finance Capabilities Were Glaring; the Company Misrepresented That it Had Remediated Deficiencies in Internal Controls Over Financial Reporting

172.    All Defendants either knew, or recklessly disregarded, that BigBear's accounting department was seriously understaffed and unable to competently prepare BigBear's publicly reported financial statements. FE 4 described the accounting department as a "dumpster fire," and FE 2 labelled it "a shitshow." Defendants Long, Peffer, and Ricker were personally involved in creating and then overseeing attempted remediation of the Company's material weaknesses in internal controls. And they misleadingly reported that the material weaknesses previously disclosed in March 2023 had been remediated by December 31, 2023. But, per FE 4, remediation efforts continued into 2024. And per the Company's own public disclosures, BigBear lacked internal control over financial reporting throughout all of 2023 and most (if not all) of 2024. In the context of the March 2025 restatement, Defendants BigBear, Peffer, Ricker, and AE-

affiliated directors conceded, "We have not consistently executed our technical accounting review policies." FE 4 confirmed that they did not recall BigBear evaluating or reassessing the accounting treatment for the 2026 Convertible Notes and their embedded conversion option during their tenure at the Company in 2023 and 2024.

173.    All four FEs confirmed that the accounting and finance team continued as an understaffed, resource-strapped, and overall deficient operation at least through the end of 2024. As a whole, the FE accounts show high turnover, disorganization, and limited capabilities in BigBear's financial reporting and accounting personnel, how problems would be put off after they arose and were reported to management, gaps in leadership, and an excessive amount of internal control monitoring being placed on one employee.

174.    As described above, FE 1 explained that the accounting department had multiple rounds of layoffs and that critical roles in accounting were frequently left unfilled; FE 2 detailed persistent accounting issues (such as incorrect account balances, problematic migration of data from the Pangiam acquisition, and retroactively booking revenue adjustments) and how Defendant Ricker and Thompson would ignore issues flagged by the accounting team; FE 3 described how Defendant Peffer aggressively restructured the finance department by removing experienced personnel and replacing them with underqualified individuals from her personal network; and FE 4 explained the small size and "top heavy" nature of the internal team responsible for financial reporting and how FE 4 was alone responsible for around 90 of the Company's internal controls. FE 4 described the process of preparing the 2024 10-K as "brutal" because of how under-resourced BigBear's internal accounting team was.

175.    The 2023 10-K described the involvement of BigBear's management in remediating the internal control deficiencies described the prior year, stating that "management

completed the implementation of our remediation efforts of the material weaknesses" which included "enhancing our control design and demonstrating our ability to effectively operate our controls[,] [m]anagement enhanced the risk assessment process and design of internal control over financial reporting," and "management has concluded, through testing, that these controls are operating effectively."

176.    In sum, Defendants Long, Peffer, Ricker, and AE created an internal environment highly vulnerable to errors, misjudgments, and misstatements, yet remained heavily involved in monitoring the Company's internal controls over financial reporting. The FE accounts, as well as the Defendants' involvement on the Board and Audit Committee, demonstrates that they knew, or were reckless at minimum, to BigBear's accounting issues.

**C.    Defendant AE Dumped Hundreds of Millions of Shares of BigBear Stock While Knowing of the Unremediated Deficiencies in BigBear's Internal Controls, the Company's False and Misleading Statements, and BigBear's Impending Need to Restate Financials Going Back to Year-End 2022**

177.    As stated above, AE controlled nearly every aspect of the Company's financial and accounting decision-making and reporting. AE was a controlling shareholder and held at least half of the seats on the Board of Directors. AE also excepted itself from the standard barriers to conflicted conduct. AE was carved out of the Insider Trading Policy, and its transactions with BigBear (which would otherwise require an Audit Committee determination that they were consistent with the Company's best interests) were retroactively deemed pre-approved by the Audit Committee.

178.    At the start of March 2024, AE held approximately 165 million shares of BigBear stock, accounting for approximately 75.2% of BigBear's equity. Before March 2024, AE had only sold a relatively small amount of BigBear common stock in May 2023.

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 05/30/23 | Common Stock | $2.44 | -361,096 | -$881,074.24 |
| 05/26/23 | Common Stock | $2.42 | -749,909 | -$1,814,779.78 |
| 05/25/23 | Common Stock | $2.45 | -960,012 | -$2,352,029.40 |
| 05/24/23 | Common Stock | $2.41 | -339,060 | -$817,134.60 |
| 05/23/23 | Common Stock | $2.48 | -502,294 | -$1,245,689.12 |
| 05/22/23 | Common Stock | $2.40 | -189,232 | -$454,156.80 |
| 05/19/23 | Common Stock | $2.42 | -148,229 | -$358,714.18 |
| 05/18/23 | Common Stock | $2.43 | -1,428,937 | -$3,472,316.91 |
| 05/17/23 | Common Stock | $2.43 | -1,252,677 | -$3,044,005.11 |
| 05/16/23 | Common Stock | $2.41 | -669,318 | -$1,613,056.38 |
| 05/15/23 | Common Stock | $2.48 | -1,939,414 | -$4,809,746.72 |
| 05/12/23 | Common Stock | $2.43 | -618,067 | -$1,501,902.81 |
| 05/11/23 | Common Stock | $2.51 | -98,909 | -$248,261.59 |
| 05/10/23 | Common Stock | $2.66 | -1,604,426 | -$4,267,773.16 |

179.    But starting in March of 2024, AE began to take steps towards exiting its investment in BigBear.

180.    Across seven transactions in March 2024, AE sold 22,777,874 shares for $58,389,847.2 in proceeds, reducing AE's equity stake to 64.8%. At the time of these sales, AE (through its partners on the Board) knew of the ongoing (and unremedied) deficiencies in BigBear's internal controls over financial reporting, as well as the origin of those deficiencies (AE's own decision-making around staffing).

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 03/15/24 | Common Stock | $2.47 | -2,461,867 | -$6,080,811.49 |
| 03/14/24 | Common Stock | $2.55 | -8,009,447 | -$20,424,089.85 |
| 03/13/24 | Common Stock | $2.53 | -4,777,012 | -$12,085,840.36 |
| 03/12/24 | Common Stock | $2.44 | -139,527 | -$340,445.88 |
| 03/11/24 | Common Stock | $2.47 | -1,832,678 | -$4,526,714.66 |
| 03/08/24 | Common Stock | $2.58 | -2,857,343 | -$7,371,944.94 |
| 03/08/24 | Common Stock | $2.80 | -2,700,000 | -$7,560,000.00 |

181.    On May 7, 2024, AE entered into a 10b5-1 trading plan to sell additional shares of BigBear (though the plan's parameters did not trigger sales until December 2024). AE could enter into a 10b5-1 trading plan because, as explained by AE's own Form 4 filed for six sales in

December 2024, "Kirk Michael Konert and Jeffrey Hart serve as Partners of AE Industrial Partners, LP. AE Industrial Partners and each AE Party may, therefore, be considered a director of the issuer by deputization." At the time AE entered into this trading plan, AE (through its partners on the Board) knew of the ongoing (and unremedied) deficiencies in BigBear's internal controls over financial reporting, as well as the origin of those deficiencies (AE's own decision-making around staffing).

182.    But despite acknowledging that AE's partners were directors of BigBear, BigBear conspicuously failed to disclose AE's 10b5-1 plan in its 1Q24 10-Q filed May 10, 2024 (or any subsequent 10-Q or 10-K), in violation of updated Regulation S-K reporting requirements effective April 8, 2024. Item 408 of Regulation S-K requires disclosure when, "during the registrant's last fiscal quarter …, any director or officer … adopted or terminated …[a]ny contract, instruction, or written plan for the purchase or sale of securities of the registrant intended to satisfy the affirmative defense conditions of Rule 10b5-1(c)" and requires "a description of the material terms, other than terms with respect to the price at which the individual executive the Rule 10b5-1 trading arrangement … is authorized to trade." 17 C.F.R. § 229.408. BigBear demonstrated it understood this new disclosure requirement by disclosing the terms of 10b5-1 plans entered into by Defendant Long on May 23, 2024 and Defendant Ricker on September 11, 2024 in the Company's August 9, 2024 and November 7, 2024 10-Qs, respectively.

183.    As revealed in BigBear's 2025 10-K filed March 25, 2025, BigBear adopted a new Insider Trading Policy effective September 11, 2024, which excluded "AE Industrial Partners, L.P. and any of its affiliated investment funds" from the list of persons subject to the Policy. At the time BigBear adopted this Insider Trading Policy, AE (through its partners on the

Board) knew of the ongoing (and unremedied) deficiencies in BigBear's internal controls over financial reporting, as well as the origin of those deficiencies (AE's own decision-making around staffing).

184.    AE then sold 19,219,860 shares across 24 transactions in October and November 2024 for proceeds of $45,749,547.45, leaving AE with approximately 50.6% equity. In December 2024, AE sold 60,908,433 shares for $196,249,693.22 in proceeds, reducing its equity stake to 32.4%.[6] At the time of these sales, AE (through its partners on the Board) knew of the ongoing (and unremedied) deficiencies in BigBear's internal controls over financial reporting, as well as the origin of those deficiencies (AE's own decision-making around staffing).

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 12/26/24 | Common Stock | $4.15 | -6,075,697 | -$25,214,142.55 |
| 12/19/24 | Common Stock | $3.63 | -153,250 | -$556,297.50 |
| 12/18/24 | Common Stock | $3.59 | -2,860,843 | -$10,270,426.37 |
| 12/17/24 | Common Stock | $3.11 | -2,574,535 | -$8,006,803.85 |
| 12/16/24 | Common Stock | $2.89 | -5,313,090 | -$15,354,830.10 |
| 12/13/24 | Common Stock | $2.52 | -2,851,290 | -$7,185,250.80 |
| 12/12/24 | Common Stock | $2.69 | -3,763,502 | -$10,123,820.38 |
| 12/11/24 | Common Stock | $2.94 | -3,248,938 | -$9,551,877.72 |
| 12/10/24 | Common Stock | $3.27 | -4,146,835 | -$13,560,150.45 |
| 12/09/24 | Common Stock | $3.93 | -9,003,424 | -$35,383,456.32 |
| 12/06/24 | Common Stock | $3.39 | -6,328,238 | -$21,452,726.82 |
| 12/05/24 | Common Stock | $2.96 | -4,775,664 | -$14,135,965.44 |
| 12/04/24 | Common Stock | $2.68 | -3,528,158 | -$9,455,463.44 |
| 12/03/24 | Common Stock | $2.61 | -5,245,770 | -$13,691,459.70 |
| 12/02/24 | Common Stock | $2.22 | -1,039,199 | -$2,307,021.78 |
| 11/29/24 | Common Stock | $2.27 | -1,094,452 | -$2,484,406.04 |
| 11/27/24 | Common Stock | $2.12 | -867,877 | -$1,839,899.24 |
| 11/26/24 | Common Stock | $2.10 | -1,075,687 | -$2,258,942.70 |
| 11/25/24 | Common Stock | $2.40 | -2,181,844 | -$5,236,425.60 |
| 11/22/24 | Common Stock | $2.42 | -2,382,851 | -$5,766,499.42 |
| 11/21/24 | Common Stock | $2.21 | -1,821,619 | -$4,025,777.99 |
| 11/20/24 | Common Stock | $2.04 | -795,530 | -$1,622,881.20 |

---

[6] 39,446,644 of the 60.9 million shares AE sold in December 2024 (transactions on December 5, 2024, December 6, 2024, December 9, 2024, December 18, 2024, December 19, 2024, and December 26, 2024) were sold pursuant to a 10b5-1 plan adopted May 7, 2024.

| 11/19/24 | Common Stock | $1.80 | -97,785 | -$176,013.00 |
| 11/18/24 | Common Stock | $1.79 | -388,023 | -$694,561.17 |
| 11/15/24 | Common Stock | $1.76 | -7,600 | -$13,376.00 |
| 11/14/24 | Common Stock | $1.77 | -251,700 | -$445,509.00 |
| 11/13/24 | Common Stock | $1.79 | -205,817 | -$368,412.43 |
| 11/12/24 | Common Stock | $1.84 | -751,880 | -$1,383,459.20 |
| 11/11/24 | Common Stock | $1.91 | -3,201,746 | -$6,115,334.86 |
| 11/08/24 | Common Stock | $1.76 | -1,175,196 | -$2,068,344.96 |
| 11/07/24 | Common Stock | $1.76 | -65,047 | -$114,482.72 |
| 11/05/24 | Common Stock | $1.77 | -859,317 | -$1,520,991.09 |
| 10/30/24 | Common Stock | $1.75 | -16,523 | -$28,915.25 |
| 10/29/24 | Common Stock | $1.77 | -562,400 | -$995,448.00 |
| 10/21/24 | Common Stock | $1.75 | -5,500 | -$9,625.00 |
| 10/18/24 | Common Stock | $1.77 | -389,534 | -$689,475.18 |
| 10/17/24 | Common Stock | $1.75 | -10,075 | -$17,631.25 |
| 10/16/24 | Common Stock | $1.76 | -439,040 | -$772,710.40 |
| 10/15/24 | Common Stock | $1.78 | -572,817 | -$1,019,614.26 |

185.    On December 19, 2024, BigBear announced on Form 8-K that it had entered into "separate, privately negotiated exchange agreements" with holders of the 2026 Convertible Notes accounting for "approximately $182.3 million in aggregate principal amount of the "2026 Notes," by which the debt due on the 2026 Notes is instead due in 2029. These new 2029 Notes would be secured (instead of unsecured) and pay higher interest rates under certain conditions. These negotiations had occurred for some time preceding the public announcement of the completed deals. Per FE 4, renegotiating a debt instrument like the 2026 Convertible Notes would have required the Company to look at the existing debt, the new agreements, and the prior accounting treatment of the existing debt. This assessment would have highlighted the improper accounting treatment applied to the 2026 Convertible Notes since their inception. In order words, by renegotiating the 2026 Convertible Notes, AE learned that BigBear would have to restate financials going back to the Company's first publicly reported financials.

186.    Across 11 transactions in March 2025, AE sold 36,551,743 shares for proceeds of $147,532,223.10.[7] At the time of these sales, AE (through its partners on the Board) knew of (1) the ongoing (and unremedied) deficiencies in BigBear's internal controls over financial reporting, as well as the origin of those deficiencies (AE's own decision-making around staffing); and (2) BigBear's impending need to restate financials going back to the Company's first publicly reported financials.

| Date | Security | Price | Units | Value |
|---|---|---|---|---|
| 03/26/25 | Common Stock | $3.51 | -5,150 | -$18,076.50 |
| 03/17/25 | Common Stock | $3.56 | -2,314,872 | -$8,240,944.32 |
| 03/14/25 | Common Stock | $3.49 | -5,216,361 | -$18,205,099.89 |
| 03/13/25 | Common Stock | $3.28 | -1,707,837 | -$5,601,705.36 |
| 03/12/25 | Common Stock | $3.33 | -3,629,108 | -$12,084,929.64 |
| 03/10/25 | Common Stock | $3.36 | -3,137,293 | -$10,541,304.48 |
| 03/07/25 | Common Stock | $3.35 | -2,660,841 | -$8,913,817.35 |
| 03/06/25 | Common Stock | $4.31 | -4,149,559 | -$17,884,599.29 |
| 03/05/25 | Common Stock | $4.61 | -4,089,824 | -$18,854,088.64 |
| 03/04/25 | Common Stock | $4.65 | -4,624,979 | -$21,506,152.35 |
| 03/03/25 | Common Stock | $5.12 | -5,015,919 | -$25,681,505.28 |

187.    In the span of a year, AE liquidated its 75% stake (as of March 1, 2024) in BigBear and reaped over $450 million, in proceeds all while fully knowing the breadth of internal control deficiencies that permeated BigBear's financial reporting, and going back to December 2024 (when BigBear renegotiated with the lion's share of the holders of the 2026 Convertible Notes) knowing the impending need to restate Company financials going back to Year-End 2022.

---

[7] In a final post-Class Period transaction, AE sold AE sold 27,430,402 shares for $78,450,949.72 on April 8, 2025.

AE made its last substantial March sale just three days before disclosing the forthcoming restatement.

## LOSS CAUSATION/ECONOMIC LOSS

188.    During the Class Period, as detailed here, Defendants' materially false and misleading statements and omissions artificially inflated the price of BigBear stock and operated as a fraud or deceit on Class Period purchasers of BigBear stock by misrepresenting and omitting material information about BigBear's internal control over financial reporting and its adherence to GAAP in reported financials. When Defendants' misrepresentations and omissions were disclosed to the market, beginning on March 18, 2025 and March 25, 2025, BigBear's stock price fell as part of the artificial inflation came out of the price. The full artificial inflation did not come out of the stock price until March 27, 2025. As a result of their purchases of BigBear stock during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

189.    Defendants' misleading statements and omissions of material facts, identified at ¶¶110-113, 123-127, 130-135, 138-141, and 149-153, had the intended effect and caused BigBear stock to trade at artificially inflated prices during the Class Period.

190.    BigBear's stock price suffered as a direct result of the disclosures made on March 18, 2025 and March 25, 2025, as detailed in ¶¶157-164, which revealed (1) that BigBear had incorrectly accounted for the conversion option in the 2026 Convertible Notes since December 2021 and would therefore have to restate financials going back to Year-End 2022; and (2) that BigBear had repeat material weaknesses in its internal control over financial reporting.

191.    Before the start of trading on March 18, 2025, as detailed in ¶¶157-158, BigBear revealed that

the Company will need to restate its audited consolidated financial statements for the fiscal years ended December 31, 2022 and 2023 and the interim unaudited consolidated financial statements for each quarterly period in 2023 and in 2024 (collectively, the "Prior Financial Statements") and that the Prior Financial Statements, as well as the Company's audited consolidated financial statements for the fiscal year ended December 31, 2021, should no longer be relied upon for the reasons described below.

192.    And BigBear also revealed that

the Company, together with Grant Thornton LLP ("Grant Thornton"), the Company's independent auditors, reevaluated the accounting presentation of the Company's convertible notes due in 2026 (the "2026 Notes"), specifically, the accounting for the embedded conversion option.

The Company determined its accounting presentation of the convertible notes had been wrong all along, and correcting this accounting presentation required restating financial statements going back to 2022

193.    Finally, the Company also disclosed that it required "additional time to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2024" because the Company and its independent auditor, Grant Thornton LLP, had reevaluated the accounting presentation of embedded conversion option in the 2026 Convertible Notes and "require[d] additional time to complete valuations necessary to determine the impact on the Company's historical financial statements…."

194.    In direct response, BigBear's stock price fell $0.52 per share, or 14.9%, from $3.49 per share at close on March 17, 2025 to $2.97 per share at close on March 18, 2025.

195. The decline in BigBear's stock price on March 18, 2025 resulted from the revelation to investors and the market of the truth about the nature and extent of and/or the materialization of risks concealed by Defendants' Class Period material misstatements and omissions.

196.    After the close of trading on March 25, 2025, as detailed in ¶¶160-163, BigBear disclosed certain restated financials going back to Year-End 2021 and revealed that the Company had "identified a material weakness in its internal controls over financial reporting which failed to prevent or detect the identified misstatements requiring misstatement." BigBear described the material weakness:

> We have not consistently executed our technical accounting review policies, inclusive of the application of certain interpretations subject to significant judgement or differences in interpretation, at a precision level sufficient to achieve complete, accurate and timely financial accounting, reporting and disclosures of certain non-routine, unusual, or complex transactions.

197.    Furthermore, BigBear disclosed that

> management concluded that due to the material weakness in the Company's internal control over financial reporting, the Company's internal control over financial reporting was not effective as of December 31, 2024, and in prior periods. In addition, as a result of the material weakness, our principal executive officer and principal financial offer concluded that our disclosure controls and procedures were not effective as of December 31, 2024.

198.    The Company's restatement also revealed that it had been significantly understating the costs of the debt from the 2026 Convertible Notes. For Year-End 2022, Amortization of Debt Issuance Costs and Discount was $11,958,000—more than 500% greater than previously reported. For Year-End 2023, that same figure was $12,965,000—more than 600% greater than previously reported—and Interest Expense and Net Loss were both more than $10 million greater than previously reported. And for each of the quarterly results reported in 2024, restated Amortization of Debt Issuance Costs and Discount similarly increased 500-600% over previously reported figures, and restated Interest Expense and Net Loss increased $8.7 million and $8.3 million, respectively, over the previously reported figures for the first nine months of 2024.

199.   In direct response, BigBear's stock price declined $0.45 per share, or 12.8%, from $3.51 per share at close on March 25, 2021 to $3.19 per share at close on March 26, 2021, and $3.06 per share at close on March 27, 2021.

200.   The declines in Bigbear's stock price on March 18, 2025, March 26, 2025, and March 27, 2025 resulted from the revelation to investors and the market of the truth about the nature and extent of and/or the materialization of risks concealed by Defendants' Class Period material misstatements and omissions.

201.   The timing and magnitude of BigBear's stock price declines on March 18, 2025, March 26, 2025, and March 27, 2025 negate any inference that the losses suffered by Lead Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' fraudulent conduct.

202.   The losses suffered by Lead Plaintiffs and other members of the Class resulted from Defendants' fraudulent conduct, which inflated BigBear's stock price, and the subsequent, significant declines in the value of that stock when Defendants' prior misrepresentations and omissions were revealed.

**CLASS ACTION ALLEGATIONS**

203.   Lead Plaintiffs bring this action as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), on behalf of a class consisting of all purchasers of the common stock of BigBear during the Class Period ("Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

204.   The members of the Class are so numerous that joinder of them is impracticable. Throughout the Class Period, BigBear traded on the New York Stock Exchange. While the exact

number of Class members is not presently known to Lead Plaintiffs, and can be ascertained only through discovery, Lead Plaintiffs believe there are thousands of members in the proposed Class. Record owners and other members of the Class can be ascertained through records maintained by BigBear and/or its transfer agent. Those record holders could be notified of the pendency of this action by mail.

205.    Lead Plaintiffs' claims are typical of the claims of the members of the Class, as all are similarly affected by Defendants' wrongful conduct in violation of federal law.

206.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the class and have retained competent and experienced securities litigation counsel.

207.    Common questions of law and fact exist as to all members of the Class and will predominate over any questions solely affecting individual members of the Class. Among the common questions of law and fact common to the Class:

(a)    Whether the Exchange Act was violated by Defendants as alleged herein;

(b)    Whether statements made by Defendants misrepresented and omitted material facts about BigBear's business, operations, and management; and

(c)    To what extent the members of the Class have suffered damages, and the proper measure of those damages.

(d)    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, given that joinder of all members is impracticable. As the damages suffered by each individual Class member may be relatively small, the burden and expense of litigating individual cases would make it all but impossible for many members of the Class to redress wrongs done to them. There will not be any difficulty in managing this action as a class action.

- 75 -

## FRAUD ON THE MARKET

208.    Lead Plaintiffs will rely on the presumption of reliance established by the fraud-on-the-market doctrine. Among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    These omissions and material misrepresentations were material;

(c)    BigBear common stock traded in an efficient market throughout the Class Period;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of BigBear common stock; and

(e)    Lead Plaintiffs and other members of the Class purchased BigBear common stock between the time Defendants misrepresented or failed to disclose material facts and the time the facts were disclosed, without knowledge of the misrepresented or omitted facts.

209.    At all relevant times, the market for BigBear common stock was efficient, as:

210.    BigBear filed periodic public reports with the SEC as a regulated issuer; and

211.    BigBear regularly communicated with public investors via established communications mechanisms, including through the regular dissemination of press releases on major news wire services, communications through the financial press, securities analysts, the internet, and other similar reporting services.

## AFFILIATED UTE RELIANCE

212.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the performance

and rollout of features at Tinder—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. That requirement is satisfied here given the importance of the issues at hand.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against all Defendants

213. Lead Plaintiffs incorporate ¶¶1-212 by reference.

214. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and concealed material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

215. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of BigBear securities during the Class Period.

216. Along with the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, the Defendants had a duty to promptly disseminate truthful information about BigBear's operations and performance that would be

- 77 -

material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market prices of the Company's securities would be based on truthful, complete, and accurate information. SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

217.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the Class have suffered damages in connection with their purchases of BigBear common stock during the Class Period, because, in reliance on the integrity of the market, they paid artificially inflated prices for BigBear securities and experienced losses when the artificial inflation was released from BigBear securities as a result of the revelations and prices decline detailed here. Plaintiffs and the Class would not have purchased BigBear securities at the prices they paid, or at all, if they had known that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

218.    Because of the foregoing, BigBear, Brothers, Kinley, Long, Peffer, and Ricker have each violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

219.    Lead Plaintiffs incorporate ¶¶1-212 by reference.

220.    During his tenure as officer and director of BigBear, Brothers was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer and director of BigBear, Brothers had the power and authority to cause BigBear to engage in the conduct complained of here. Brothers was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby

causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

221.    In his capacity as Chief Executive Officer and director of BigBear, and as more fully described herein, Defendant Brothers participated in the misstatements and omissions set forth above. Indeed, Brothers had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. Brothers had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

222.    During his tenure as officer of BigBear, Kinley was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer of BigBear, Kinley had the power and authority to cause BigBear to engage in the conduct complained of here. Kinley was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

223.    In his capacity as Chief Financial Officer of BigBear, and as more fully described herein, Defendant Kinley participated in the misstatements and omissions set forth above. Indeed, Kinley had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. Kinley had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

224.    During her tenure as officer and director of BigBear, Long was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of her position of control and authority as officer and director of BigBear, Long had the power and authority to cause BigBear to engage in the conduct complained of here. Long was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

225.    In her capacity as Chief Executive Officer and director of BigBear, and as more fully described herein, Defendant Long participated in the misstatements and omissions set forth above. Indeed, Long had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. Long had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

226.    During her tenure as officer of BigBear, Peffer was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of her position of control and authority as officer of BigBear, Peffer had the power and authority to cause BigBear to engage in the conduct complained of here. Peffer was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

227.    In her capacity as Chief Financial Officer and director of BigBear, and as more fully described herein, Defendant Peffer participated in the misstatements and omissions set forth

above. Indeed, Peffer had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. Peffer had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

228.    During his tenure as officer of BigBear, Ricker was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of his position of control and authority as officer of BigBear, Ricker had the power and authority to cause BigBear to engage in the conduct complained of here. Ricker was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

229.    In his capacity as Chief Accounting Officer of BigBear, and as more fully described herein, Defendant Ricker participated in the misstatements and omissions set forth above. Indeed, Ricker had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. Ricker had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

230.    AE was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act. Because of AE's position of control and authority, owning more than 50% of BigBear's outstanding equity and maintaining no fewer than five representatives on the Board of Directors of BigBear, AE had the power and authority to cause BigBear to engage in the

conduct complained of here. AE was able to, and did, control, directly and indirectly, the decision-making of BigBear, including the content and dissemination of BigBear's public statements and filings described herein, thereby causing the dissemination of the materially false and misleading statements and omissions as alleged herein.

231.    Defendant AE participated in the misstatements and omissions set forth above. Indeed, AE had direct and supervisory involvement in the day-to-day operations of the Company and had access to non-public information about BigBear's deceptive and risky business practices. AE had the ability to influence and direct and did so influence and direct the activities of BigBear in its violations of Section 10(b) of the Exchange Act and Rule 10b-5 as detailed in ¶¶1-218.

232.    As a result, Defendants Brothers, Kinley, Long, Peffer, Ricker, and AE were control persons within the meaning of Section 20(a) of the Exchange Act. Because of their position, and as a result of its aforementioned conduct and culpable participation, Brothers, Kinley, Long, Peffer, Ricker, and AE are jointly and severally liable, pursuant to Section 20(a) of the Exchange Act, to Plaintiffs and the other members of the Class.

233.    This claim is brought within the applicable statute of limitations.

234.    By reason of the foregoing, Defendants Brothers, Kinley, Long, Peffer, Ricker, and AE violated §20(a) of the Exchange Act, 15 U.S.C. §78(a).

### COUNT III

**For Violations of Section 20A of the Exchange Act**
**(Against Defendant AE Industrial Partners, LP)**

235.    Lead Plaintiffs incorporate ¶¶1-212 by reference.

236.    As detailed herein, Defendant AE was in possession of material non-public information regarding BigBear. Defendant AE took advantage of its possession of this material non-public information to obtain significant insider trading profits during the Class Period.

237.    Defendant AE's sales of BigBear common stock (as set forth below) were made contemporaneously with named Plaintiff Nicholas Horman's purchases of BigBear common stock (as set forth in Plaintiff Horman's certification, attached hereto as Exhibit 1) during the Class Period.

238.    Defendant AE sold the following shares of BigBear common stock for total proceeds in excess of $72 million, contemporaneously with Plaintiff Horman's purchases of the same:

| Date of Defendant AE Sale | Shares Sold | $ of Sale | Date of Plaintiff Horman Purchase | Days After Insider Sale | Shares Purchased | $ of Purchase |
|---|---|---|---|---|---|---|
| 3/8/2024 | 5,557,343 | $14,931,945 | 3/8/2024 | 0 | 84,598 | $238,688 |
| 3/15/2024 | 2,461,867 | $6,080,811 | 3/15/2024 | 0 | 1,776 | $4,349 |
| 3/4/2025 | 4,624,979 | $21,506,152 | 3/4/2025 | 0 | 2,734 | $12,876 |
| 3/6/2025 | 4,149,559 | $17,884,599 | 3/6/2025 | 0 | 350 | $1,306 |
| 3/12/2025 | 3,629,108 | $12,084,930 | 3/12/2025 | 0 | 324,991 | $1,062,400 |

239.    Defendant AE's sales of BigBear common stock during the Class Period were also contemporaneous with purchases of Class members during the Class Period. *See* ¶¶178-187 (listing Defendant AE's Class Period sales).

240.    Plaintiff Horman and other Class members who purchased BigBear common stock contemporaneously with sales by Defendant AE suffered damages because: (1) in reliance on the integrity of the market, Plaintiff and members of the Class paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder, as alleged herein; and (2) Plaintiff and members of the Class would not have purchased the securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements and concealment alleged herein.

241.    By reason of the above conduct, Defendant AE is liable pursuant to §20A of the Exchange Act, 15 U.S.C. §78t-1.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiffs demand a trial by jury.

DATED: August 8, 2025

Respectfully submitted,

*/s/ Steven J. Toll*
Steven J. Toll (Va. Bar No. 15300)
Julie Goldsmith Reiser
S. Douglas Bunch
**COHEN MILSTEIN SELLERS
  & TOLL PLLC**
110 New York Avenue NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jreiser@cohenmilstein.com
dbunch@cohenmilstein.com

*Liaison Counsel for Lead Plaintiffs*

Jeffrey C. Block (*pro hac vice* forthcoming)
Jacob A. Walker (*pro hac vice* forthcoming)
Sarah E. Delaney (*pro hac vice* forthcoming)
Michael D. Gaines (*pro hac vice* forthcoming)
**BLOCK & LEVITON LLP**
260 Franklin Street, Suite 1860
Boston, MA 02110
(617) 398-5600 phone
(617) 507-6020 fax
jeff@blockleviton.com
jake@blockleviton.com
sarah@blockleviton.com
michael@blockleviton.com

*Counsel for Lead Plaintiffs Ning Sun and Yang
Zen and Lead Counsel for the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of August 2025, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notification to counsel of record.

/s/ Steven J. Toll
Steven J. Toll (VA Bar No. 15300)
**COHEN MILSTEIN SELLERS**
  **& TOLL PLLC**
1100 New York Avenue NW, Suite 800
Washington, DC 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com