UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **SEAN PRIEWE,** | : |
| **et al.,** | : |
| **Plaintiffs,** | : Civil Action No. 1:25-cv-00623-PTG-WEF |
| **v.** | : |
| **BIGBEAR.AI HOLDINGS, INC.,** | : May 15, 2026 10:02 a.m. |
| **et al.,** | : |
| **Defendants.** | : |
| .............................. | : |

**TRANSCRIPT OF MOTION HEARING PROCEEDINGS**
**BEFORE THE HONORABLE PATRICIA TOLLIVER GILES,**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

For the Plaintiffs:

**Steven Jeffrey Toll, Esq.**
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW
Suite 800
Washington, DC 20005
202-408-4600
Fax: 202-408-4699
Email: Stoll@cohenmilstein.com

**Jeffrey C. Block, Esq.**
Block & Leviton LLP (MA-NA)
260 Franklin Street
Suite 1860
Boston, MA 02110
617-398-5600
Fax: 617-507-6020
Email: Jeff@blockleviton.com

APPEARANCES: (Cont.)

For the Plaintiffs:

**Michael D. Gaines, Esq.**
BLOCK & LEVITON LLP (MA-NA)
260 Franklin Street
Suite 1860
Boston, MA 02110
617-398-5600
Fax: 617-507-6020
Email: Michael@blockleviton.com

For the Defendants:

**Colleen C. Smith, Esq.**
LATHAM & WATKINS LLP (CA/NA)
12670 High Bluff Drive
San Diego, CA 92130
858-523-5400
Fax: 858-523-5450
Email: Colleen.smith@lw.com

**Steven Samuel Scholes, Esq.**
MCDERMOTT WILL & SCHULTE LLP
(IL-NA)
444 West Lake Street
Suite 4000
Chicago, IL 60606
312-372-2000
Fax: 312-984-7700
Email: Sscholes@mwe.com

**Jennifer Butler Routh, Esq.**
MCDERMOTT WILL & SCHULTE LLP
The McDermott Building
500 North Capitol Street, NW
Washington, DC 20001
202-756-8165
Email: Jrouth@mwe.com

**Laura Elizabeth Bladow, Esq.**
LATHAM & WATKINS LLP (DC)
555 11th Street, NW
Suite 1000
Washington, DC 20004-1304
202-637-2367
Email: Laura.bladow@lw.com

APPEARANCES: (Cont.)

For the Defendants: **Nathan Marshall Bull, Esq.**
MCDERMOTT WILL & SCHULTE LLP
(FL-NA)
333 SE 2nd Avenue
Suite 4500
Miami, FL 33131
305-358-3500
Email: Nbull@mwe.com

Court Reporter: **Scott L. Wallace, RDR, RMR, CRR**
Official Court Reporter
United States District Court
401 Courthouse Square
Alexandria, VA 22314-5798
Cell: 443-584-6558
Email: Scottwallace.edva@gmail.com

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

**MORNING SESSION, MAY 15, 2026**

(10:02 a.m.)

THE COURTROOM CLERK: Civil Action Number 1:25-cv-623, Sean Priewe versus BigBear.ai Holdings, Inc., et al.

Counsel, please note your appearances for the record.

MR. TOLL: Good morning, Your Honor. Steven Toll of Cohen Milstein Sellers & Toll, along with me is lead counsel, Jeffrey Block, and Michael Gaines from the Block & Leviton firm. They will share the argument based on which defendant's motion you're considering.

THE COURT: Good morning to all of you.

MR. GAINES: Good morning.

MS. SMITH: Good morning, Your Honor. Colleen Smith of Latham & Watkins on behalf of BigBear and the BigBear Defendants. I'm joined by my colleague, Laura Bladow, also of Lathan & Watkins on behalf of the BigBear Defendants, and I'll be handling the argument for those Defendants today.

THE COURT: And good morning to all of you.

MR. SCOLES: Good morning, Your Honor. Steve Scholes of McDermott Will & Schulte on behalf of AE Industrial.

With me this morning is Jen Ruth, who is barred in Virginia, and my partner, Nathan Bull.

THE COURT: Good morning to all of you.

MR. SCHOLES: Thank you.

THE COURT: Okay. Hold on just one moment.

(Brief pause in proceedings.)

THE COURT: All right. And so, did you all have a plan on which motion you wanted to start with first?

MS. SMITH: We haven't discussed it, Your Honor, but it probably makes sense to start with BigBear Defendants' motion first.

THE COURT: Okay.

MR. BLOCK: I would agree with that, Your Honor.

THE COURT: All right. It's your motion, so I'll start with you.

MS. SMITH: Thank you, Your Honor. If -- if the Court -- may it please the Court. We have prepared some slides to guide the argument in hard copy.

THE COURT: Okay.

MS. SMITH: May we share those with you, Your Honor?

THE COURT: Yes, please.

MS. SMITH: Okay.

THE COURT: Do you have a second set?

MS. SMITH: Yes, we do. And I've provided a copy of the slides to my co-counsel. Would you like a hard copy?

MR. BLOCK: Sure.

MS. SMITH: Thank you, Your Honor. Again, Colleen Smith of Latham & Watkins on behalf of the BigBear Defendants.

I've got some prepared remarks, but, of course, I'm happy to answer the Court's questions and focus my remarks on the

issues that are of most interest to the Court.

THE COURT: I do have questions, but you get started, and I won't have any problem interrupting you.

MS. SMITH: Perfect. That's great. Thank you, Your Honor.

Okay. Prefatory remarks that I think set the tone for the entire argument today. This case presents a classic example of a stockholder plaintiff suing first and then working to manufacture a theory of wrongdoing.

The Plaintiff's fraud theory here makes no sense. Essentially, what the plaintiffs allege is that the individual Defendants, BigBear Defendants, knew that their accounting was wrong, that they had misaccounted for the debt instruments as complicated debt instruments that they had issued originally as part of this fact process.

And, instead of accounting for those notes correctly, deliberately decided not to account for them correctly in order to conceal the impact of that accounting in order to avoid the cost of accounting for the notes differently.

Also, not so that they could profit individually, but -- so AEIP could profit by selling its shares, and they did all of that while they had three external parties looking over their shoulders.

They supposedly under-staffed the accounting department, and, in doing that, hired two external advisors, Morgan Franklin

and Ernst & Young, both of which were helping the company with its accounting processes.

And they had, of course, an external independent auditor, as all public companies do in the form of Grant Thorton. So the fraud --

THE COURT REPORTER: I'm sorry. Say that again.

MS. SMITH: Grant Thorton. And I'm sorry. I'll try to slow down a little bit. My fault. So, the fraud, essentially, is we, BigBear Defendants, knew we were accounting for the notes incorrectly; that -- that accounting should -- was simple and should have been applied in a different way; that BigBear and the individual Defendants knew that there was an ongoing material weakness and yet covered that all up from everybody.

Morgan Franklin, EY, Grant Thorton, and went ahead and presented all of that to the public; also AEIP could trade. None of the BigBear Defendants traded. They gained absolutely nothing from this supposed fraud. And I think just the -- the starting point that the Court, you know, should ask is, why would you do that? Why does that fraud make sense? It doesn't make any sense. So that, I think, guides the whole discussion today.

So, starting -- I'd like to start with scienter. There are, obviously, two grounds for dismissal in our motion. One is falsity; one is scienter.

THE COURT: Right. Before you get there, I would like you to start by setting up, What are the misstatements? Because

there are certain pockets that they fit in or buckets that they fit in.

MS. SMITH: That's right, Your Honor. So, essentially, three categories in the misstatements -- really kind of collapses to two, but the main categories of misstatement -- or, sorry, alleged false statements relate to the accounting. So, initially, the accounting for the notes, how those were accounted for, and how the accounting was reported in the financial statements. That's one bucket of alleged false statements.

And, of course, the plaintiffs allege, when the company restated its financials and accounted for the notes differently, that corrected those false statements.

The second major bucket are the internal controls statements, and so those are statements around the effectiveness of the company's internal controls and whether or not the company was experiencing a material weakness.

And then I think the third bucket is the SOC certifications, which I think command less attention here because those are relatively straightforward opinion statements that should be dismissed on that basis. But the two sort of primary allegations, as we understand them, are the accounting statements, and then the internal controls statements.

Okay. So, starting with scienter, of course, as I already alluded to, none of the BigBear Defendants had any financial profit motive here.

That means, under controlling Fourth Circuit law, the Court should scrutinize the scienter allegations at a heightened level. When there's no motive, additional allegations are required to establish scienter under the federal securities laws, and the plaintiffs haven't met that bar.

Now, the only motive that plaintiffs allege with respect to the BigBear Defendants supposedly is that they were incentivized to allow AEIP to execute its exit strategy and to sell stock. That's pure speculation. There are absolutely no specific allegations in the complaint that establish any facts supporting that theory. So that theory can be thrown out on that basis. And if you would look at the first line in -- in the dec, in this -- this is another theme that runs through our scienter arguments, which is a quote from *Tellabs*. And *Tellabs*, of course, is a Supreme Court case. It's been around for a little while, but this quote from *Tellabs* is instructive and important in terms of how the Court should think about scienter. And that is that omissions and ambiguities count against inferring scienter. It's Plaintiff's burden to plead scienter with particularity. And when there are gaps, the gaps, the gap goes to the defendant, not to the plaintiff. That's what *Tellabs* says. Here, the gap is that there are no allegations that anybody at BigBear was motivated to help AEIP to sell their stock. So that pleading gap -- the Defendants win that gap, right? There are no specific allegation to that motive, so it

falls away.

Okay. So, absent motive, the Plaintiffs have to meet a heightened standard in order to plead scienter. And sort of how do they do that without motive? They need to allege particularized facts that our Defendants knew or were reckless with respect to whether the accounting statements or the internal control statements were false or misleading, and there are no allegations that establish that.

I'll go through a few of the other issues, but I think the primary allegations that plaintiffs rely on to establish that knowledge and recklessness component of scienter are the confidential witnesses, and so I'm happy to go through those with Your Honor, because Your Honor may have questions about those in particular.

If you turn to slide 5 -- I've got a couple of slides here. On each of the confidential witnesses, there are, of course, four of them.

So, Confidential Witness 1 can be readily dispensed of. Confidential Witness 1 was an HR generalist, so worked in human resources, not in accounting. That's strike one. Strike two, no contact with any defendant.

And then strike three, the only thing that CW 1 really alleges is that he or she had an understanding that the accounting department was under-resourced and under-staffed.

Those -- these allegations are insufficient, as a matter

of law, under controlling Fourth Circuit law -- that's the *Yates* decision -- to establish scienter.

So CW 1 we can cross off. Doesn't really contribute anything.

The next slide is CW 2. CW 2 was a staff accountant. During a more relevant period of time, February of 2024 to April 2025. But, again, while this individual was in accounting, his or her role was in accounts payable; not in accounting for notes, not in overseeing the publication of the company's 10-Qs or 10-Ks in a different role, essentially processing invoices and the like. So not involved in the notes. And, actually, there are no allegations that CW 2 was in any way involved with any of the accounting for the notes, much less involved with any reporting around whether or not the company had a material weakness in its internal controls.

Again, the theme for CW 2 was that he or she says there was organizational instability and a lack of resources in the accounting department. But, again, that does not establish scienter. Again, that's *Yates*, which is controlling Fourth Circuit law.

And he or she also points to speed bumps in the merger integration process and other, you know, accounting issues, but none of those relate to any of the issues that are presented in this case. They're not related to the notes.

There's no allegation from CW 2 that any of the --

THE COURT: Well -- and that's a question that I had, because -- what are they really alleging was the source of the loss? Is it the notes, or is it just the chaos overall in the accounting department? And we're talking about the internal controls -- I mean, because there are a fair number of allegations with respect to how bad it is, and, therefore, because it is so bad, that they should have at least -- it's at least a showing of recklessness. But was that the source of the loss, or was it just the issue with respect to the notes?

MS. SMITH: Great question, Your Honor. So, there are two stock drops in the case, and those are the sources of the loss.

The first one relates to the announcement of the restatement. So the first source of the loss is the restatement itself.

And that only relates to the notes and has nothing to do with general chaos in the accounting department.

Now, plaintiff might stand up here and say, Well, because there was understaffing and chaos that led to the issue with the notes -- but that's just made up, right? There's no facts that support -- there's no connection between any of this supposed chaos in understaffing in the accounting department and the way that the company accounted for the notes. There is no allegation on that front at all.

The second drop relates to the company's announcement in connection with its quarterly financial report. Really, that

time it was the 10-K, so it was the annual financial report; that the company was experiencing material weakness in its internal controls. That's the second drop.

And that material weakness is directly connected to the notes. It was a technical accounting issue, and. When you restate your financials, it is very typical for the auditor to then say, Well, you have a material weakness in your internal controls because you had to issue a restatement. Your controls failed to pick up this thing that required the restatement, therefore you have a material weakness and that is what the company announced and again that material weakness didn't have anything to do with under staffed, et cetera.

Now there -- again, controlling case law if you look at *Yates*, which is 744 F.3d at 887, Fourth Circuit case.

In that case, there were allegations about organizational instability and, quote, lack of resources in the accounting department, and the Court said that's not enough under Fourth Circuit law to establish scienter. So same thing here.

And then, finally, I think, with respect to all allegations around generalized understaffing chaos, et cetera, in the accounting department, plaintiffs are ignoring the fact that the company decided to outsource some of its accounting function. Right? The company doesn't have to do all of this in-house. It's a new public company. It's allowed to say, you know what, we don't have enough people in our accounting department, so

we're going to hire Ernst& Young, which is one of the best accounting firms in the country, to help us, which was they did, and we're going to hire Morgan Franklin as an outside consultant to help us. So the company can be understaffed in its accounting department and can say, Hey, we don't have enough people, lets go get some help, and that's exactly what they did.

Now, I think -- just think about this for a second. If you were going to commit a fraud by, you know, understating your -- misstating your accounting for your financial -- your notes, or by concealing the fact that you had a material weakness why would you want to hire external people to help you, right? Like, I think, if you were going to commit a fraud, you would keep that all in-house, and you wouldn't say, I need Ernst Young to help me and make sure that what I'm doing is correct. The theory does not hold together. It just doesn't make sense that the company would say, I'm going to bring in Ernst & Young to help me, and, meanwhile, I'm being reckless about how I'm reporting my accounting. It doesn't work, right? They're doing what they can do and what they need to do to try to get their accounting right, which is to hire an external auditor.

I do want to skip -- I don't want to run out of time, so I do want to skip CW 4, because CW 4 is obviously a -- a focus for plaintiffs, and it's a focus in the briefing.

So, CW 4 is, perhaps, admittedly, the most potentially relevant CW. And the core allegation of CW 4 is that the

company -- just to set the table in terms of time -- the company had in -- in March of 2024 had said, We've remediated our material witnesses. We had material weaknesses in our internal controls with the three different material weaknesses, which the company reported over time. March of 2024, we've remediated those. We've put in place procedures to remediate those. We can't promise you we're not going to have material weaknesses in the future, but we think with what we've done for these material weaknesses is complete and we've remediated those.

According to CW 4, in a very loosey-goosey way, plaintiffs say, well, that wasn't true, that the material weaknesses were actually continuing in early 2024; therefore, when the company said we don't -- we've remediated these material weaknesses, that wasn't true. But that's based on some very inconsistent allegations, and the Court needs to take into account the inconsistencies and how the CW 4 allegations are pled, as well as a very vague pleading. And, again, the vague pleading goes -- that goes to the Defendants. The inferences go to the Defendants under *Tellabs*, not to the plaintiffs.

Let me point the Court to a couple of the inconsistencies with respect to CW 4's allegations the first one is on slide 9.

In the complaint, the plaintiffs say that -- they call him F -- they call these people FEs.

THE COURT: Former Employees, yes.

MS. SMITH: Yeah. They really are confidential witnesses.

They just don't like the framing, so they change it to "former employees." The traditional way of talking about them is confidential witnesses, so that's what we've done. But former Employee 4 is alleged to have worked on the preparation of the 2024 year-end financial report filed on SEC Form 10K. And then he or she goes on to say the audit process was brutal, and explains that, you know, typically for the year-end financial report, that work starts in January of the following year. Well, the preparation of the 2024 year-end financial report started in January of 2025, which is more than six months after Confidential Witness 4 left the company. So it can't be the case that Confidential Witness 4 worked on the preparation of the 2024 year-end audit. That just cannot be true. It doesn't work.

Now, the plaintiffs may say, oops, that was a typo, we meant he worked on the 2023 year-end financial report, but that's not what the complaint alleges, and they haven't said that.

So, the plaintiffs, again, are stuck with their pleading, and this is an inconsistency in their reporting around CW 4.

If you go to page 10 or slide 10, there's another --

THE COURT: Hold on a second. I don't want to move past that.

MS. SMITH: Yes.

THE COURT: Because, if it is just a typo, and it is the 2023 year-end report, would that change anything here?

MS. SMITH: Well, it would change -- it could, because it

could -- the answer is no, because the allegation is only that he worked on the report, and supposedly it was brutal.

There's no meat to the substance of the allegations around what was done with the year-end report. He doesn't, for example -- or she doesn't, for example, say, Yeah, I worked on the 2023 year-end financial reporting early 2024, and it was false.

THE COURT: Right.

MS. SMITH: It does not say that, right? So, so even less helpful, I suppose. Great question. Okay, slide 10, second inconsistency on CW 4. Again, the main allegation from CW 4 was that there was an ongoing material weakness in the internal controls over financial reporting.

That's the allegation in paragraph 161 -- sorry, 61 and 145 of the complaint. If you look at paragraph 92 of the complaint, the -- CW 4 actually says something different, and this is important. What CW 4 says in paragraph 92 is that his or her duties were to remedy, quote, "deficiencies" in internal controls over financial reporting, and that plenty of new ones emerged unaddressed, but he or she doesn't say "material weaknesses." He or she says "deficiencies," and in the accounting literature, a significant deficiency in internal controls is one thing; any material weakness in internal controls is a different thing.

And we cited -- I believe it's Exhibit 18 for that

proposition. It's just the general PCOA -- PCAOB rules, and I actually think, if you ask Mr. Block whether he would agree with that, I think he would agree that sufficient deficiencies and material weaknesses are not the same thing. It's a pretty basic proposition in the --

THE COURT: Well, help me with that.

MS. SMITH: Yeah.

THE COURT: What is the difference? And I'm assuming the material weaknesses is somewhat more severe.

MS. SMITH: Correct. That's right, Your Honor. That's exactly right. So, if CW 4 is alleging that there were deficiencies but is not saying that he or she had knowledge of material weaknesses, that would mean that the BigBear statements about the fact that there were no material weaknesses and no unremediated material weaknesses is not false.

And -- and again, I think the plaintiffs need to be held to the higher pleading standard here. This kind of lack of care or sloppiness, again, that has to go to the defendant, right? If they're unclear about what their CW allegations are, that inference goes to the defendant.

And then I think the final thing to think about with CW 4, if you look at paragraph 62 of the complaint, the wording that's used in paragraph 62 is incredibly careful. Plaintiff alleges that CW 4 says there were continuing material weakness.

And then, in that same paragraph, it goes on to say, "The

audit committee was apprised and informed during 2024 that BigBear continued to have material weakness and internal controls." The plaintiffs don't say who informed the audit community of this fact. They don't say that CW 4 informed the audit committee of this fact. And they don't say what vehicle this came through.

Now, they do go on in the next sentence to refer to presentations by Morgan Franklin. Again, Morgan Franklin was one of the third-party advisors to the company. That said, they were supposedly ongoing unre -- well, it -- it doesn't say what's in the presentation, but they're implying that the Morgan Franklin presentation said there were ongoing material weaknesses, but that's not what the complaint says. It's set up in a very careful way to have the reader infer that's what's happening, but it's not exactly said that way, and the words that are used are quite passive in the framing, and so I think that's deliberate, Your Honor.

I think the plaintiffs don't actually have from CW 4 that person saying, Hey, I was in an audit committee meeting and the audit committee and the board were told that there were ongoing material weaknesses. I don't think that's what CB -- CW 4 actually said to the plaintiffs, and I think that's why that's not in the complaint.

And I would say this: That makes sense, because the idea that the audit committee of a public company receives a

presentation from a third party that says, Hey, you guys have ongoing material weaknesses, and then the audit committee turns around and signs off on financial statements that say, We don't have material weaknesses for no reason. It doesn't make any sense. It -- it's not a thing that an audit committee would do, and it just doesn't make sense. And so I think the plaintiffs need to be put through their paces on CW 4, because I think they framed it in a way that's intended to make more of CW 4 than likely what their investigator heard from CW 4.

And then a couple of just quick final notes on the scienter standard that I think are important to the Court's consideration of this issue. One is the *Knurr* case that Judge -- Judge Ellis's decision from six or seven years ago in *Knurr versus Orbital ATK*. It's really a pivotal case for this case and for this decision, a very well-reasoned -- it says exactly the kind of facts that we have here; that somebody makes a mistake in the accounting and then that is later corrected is not sufficient to allege scienter. You really need a plus factor, a specific allegation of showing that that was done intentionally or recklessly, and that doesn't exist here.

And then the fact -- and this is in both in the *Knurr* and the *Yates* case -- the fact that the external auditors signed off on the accounting supports a good faith inference; not fraud.

So those two cases, *Knurr* and *Yates*, we think are determina -- determinative on scienter.

And then, as I've already said, I -- I think, just logically thinking about the fact that BigBear did, in fact, rely on external experts contradicts fraud. I mean, the -- the more compelling inference is good faith from that; not a fraud-based inference. So, we think, based on all that, there's no scienter here. I also want to pivot to falsity, but let me stop and see if the Court has any other questions on that.

THE COURT: I don't.

MS. SMITH: Okay. Thank you. Okay. So two -- two again, the two buckets of category -- of false statements are the accounting statements and the internal control statements. Again, they are soft certifications, but I think that's -- those are clearly disposed of as opinion statements. There's lots of good case law on that. So that shouldn't be, I think, as much of a focus.

On the financial reporting statements, we think *Omni Care* controls. Under *Omni Care*, financial reporting that requires accounting judgments is subject to *Omni Care*.

The reason that matters, of course, is because the statement can be objectively false. You counted for your notes one way; you later corrected that and accounted for them a different way.

The plaintiffs are right, that's -- the statement was objectively false, and you fixed it. But, under *Omni Care*, they also have to show subjective falsity in order to plead falsity

under the PSLRA. And what that means is they have to show the statement was intentionally -- was made sort of intentionally knowing it was false -- or at least recklessly with respect to whether it was false. And they haven't met that burden, largely for the same reason they haven't met the scienter burden. They haven't showed that BigBear, the defendant, believed that the accounting treatment that was applied to the notes in 2022 or 2023 was wrong. There are no allegations whatsoever that establish that.

THE COURT: It's almost like you're talking about two entirely different principles as well, because they describe it very simply, and I had to read through your description several times to kind of track it, in terms of how the notes should be accounted for.

MS. SMITH: Exactly right, Your Honor. So, this is one of the things in the Plaintiff's briefs that is a little bit incomplete, if I'm being generous. They have quoted only one section of the relevant accounting standard, which is ASC 815, as Your Honor well knows, and they've said, Look, this is really simple. This is just one -- this is the one sentence application of this rule, it's really simple, how could they have gotten this wrong?

I agree with you, Your Honor, that if you look at the whole rule, it is complicated. There are multiple steps. There's a rule, there's an exception to the rule, and then

there's an exception to the exception to the rule.

It's a pretty long accounting standard that, on its face, is complicated and requires judgment. And the whole point of *Omni Care* is, when you have these kind of complicated accounting judgments, those are opinion statements because they require judgment to decide how to apply the standard.

THE COURT: And is this always also the instance when BigBear did not make this decision in and of itself that had the outside auditor also involved in this?

MS. SMITH: That's right. That's absolutely right, Your Honor. BigBear actually identified the error and then worked through it with the auditor, but that's exactly right.

The first couple years when BigBear was accounting for the notes one way, it did that with the approval of the auditor. The error was identified. BigBear worked with the auditor and restated the financials and fixed it, but always with the external auditor. That's exactly right. And that's where the *Knurr* and *Yates* precedent come into play. Courts are very clear in that situation. It's not scienter. These are complicated accounting judgments. People get them wrong. It happens. You discover the error; you fix it. That's exactly what the company did. So that's right.

And I'm happy to go through the accounting standard, but I think it almost -- it kind of almost speaks for itself in terms of its complexity, if you read the whole thing. It really comes

down to, you -- do you have to account for the notes as one unit, or do you have to account for the debt and the equity separately, which is what the company leader did. But, in order to figure that out, you have to go through the whole standard, which is full of exceptions. Not as simple as plaintiffs say.

And then, Your Honor, if you conclude that the accounting statements are, in fact, subject to *Omni Care* because they are opinion statements, there's no subjective falsity for all the reasons that I've already articulated and apply equally to scienter, right? No individual BigBear defendant is alleged to have acted -- or believed that the statements were false at the time that they were being --

So then we come to internal controls, and I think, on the internal control statements, you know, frankly, I think it really does come down to how you see CW 4, because there are no other allegations in the complaint at all that establish that any of the company's statements around its internal controls were false.

There is one set of internal controls that, in fact, for which the company had experienced a material weakness, it disclosed. It identified those -- disclosed those to the world, told the world, Hey, we're a new public company. We have some material weaknesses. We might have some more in the future. That was all done. They identified this ASC 815 accounting issue, and then they were like, Okay, you know what, we have a new material weakness; we're telling you about that. So that's

exactly what you would expect a company to do.

The only gap in this is whether or not you think that CW 4 has done enough to allege that the company was experiencing a material weakness as of March of 2024 when the company issued its -- again, it's the annual report -- the company says, We have these prior material weaknesses; we have remediated them; we can't promise we won't have more, but we think we've remediated these. It then identifies the 815 accounting issue, reports that, and says, Now we have a new material weakness associated with that.

Just to remind you of the timeline, it's just this little gap between December 2023 and March of 2024 where there's a question of whether the company was, in fact, experiencing any material weaknesses at the time. And the only allegations that go to that are CW 4, and the CW 4 allegations are internally inconsistent, and they're vague. And so, therefore, they can't be credited.

And, again, I think it does come down to common sense. Do you really believe that the company knew it had material weaknesses but went out to the market and said, "No, we dont, with no motive; no reason to do that whatsoever.

THE COURT: You're treating the BigBear Defendants collectively, but there are also individual Defendants that we need to look at and consider also, and the one who seems to have the most allegations directed at him is Mr., I believe it's

Ricker.

MS. SMITH: Correct, Your Honor.

THE COURT: So, please address him.

MS. SMITH: Yes. So the allegations against -- that's correct, Your Honor. So, before I address your question, I will just note that Defendants Brothers and Kinley, there are no allegations whatsoever against them. So, they should, of course, be readily dismissed. And I would be doing them a disservice if I didn't say that as well. There are no really good, specific allegations against anybody else.

But as you note, Your Honor, the most allegations are focused on Mr. Ricker. Those allegations fall into really two buckets. One is, he attended meetings, and there are no allegations about -- so attended meetings, audit committee board meetings, but there are no allegations about what was presented in those meetings that supposedly contradicted any of the statements. So meeting attendance is not good enough.

And then there are allegations about staffing, understaffed, didn't answer my questions fast enough, you know, wasn't responsive, that sort of thing.

Fourth Circuit law, *Yates* and other cases, says those allegations are not sufficient to establish scienter as to that individual defendant. Specific allegations that he knew about a potential problem with the notes or of a material weakness are required.

That's actually supported by the supplemental authority that we presented as well as the *Auto Parts* -- I'm going to forget the name -- the *American Auto Parts* case that says specific allegations are required in that circumstance for scienter.

The final allegations -- maybe three buckets. The final allegation against Mr. Ricker is that he worked closely with the auditor, and there's an argument -- I think one of the CWs, maybe it's CW 3 -- says, Hey, I saw Ricker working with Grant Thorton. And the implication they want you to draw from that is that, Well, that's bad. He was too cosy with the auditor. But, like, you would expect the CFO to work with the independent auditor. That's exactly what you want the CFO to do. So the implication from --

THE COURT: But I thought there were specific allegations as to what C 4 shared with Mr. Ricker.

MS. SMITH: I am -- I do not believe that's the case, Your Honor. And maybe the plaintiff -- maybe Mr. Block will correct me, but I don't think that's right.

There are specific --

THE COURT: I thought they were bringing certain things to his attention specifically? Am I wrong about that? Maybe I'm confusing which in particular of the former employees, but there was -- I thought there were specific allegations.

MR. BLOCK: It was F(e)(2), Your Honor.

THE COURT REPORTER: I'm sorry?

THE COURT: It was F(e)(2).

MS. SMITH: And so --

THE COURT: And you had some -- you already covered F(e)(2).

MS. SMITH: Yes, I did. That's right. Different department, different issues, unrelated.

THE COURT: Okay.

MS. SMITH: I'm -- with that, I'm happy to answer any other questions.

THE COURT: I think those were all of the questions that I have for you.

MS. SMITH: Great. Thank you so much, Your Honor.

MR. BLOCK: Good morning, Your Honor. Jeffrey Block for the plaintiffs.

And, Your Honor, let me just, before I start off, I think step back a little bit to basic --

You heard a lot from Ms. Smith about putting us through our paces, making sure, you know, how we pled everything.

Even under the PLSRA, the Court is still supposed to construe the complaint in a light most favorable to the plaintiff and accept all the well-pled allegations as true.

So, I understand they want to --

THE COURT: But it's still a heightened bar for you.

MR. BLOCK: It is. It's a heightened pleading bar.

There's no question about it.

THE COURT: Right. It's one of the most difficult ones, I think.

MR. BLOCK: I would agree with you there, Your Honor, yes, it is. So, what I would like to do is start off with a question that you asked Ms. Smith about, the losses and the stock drops.

And there were two different stock drops based on two different pieces of information that came into the market.

The first was on March 18th when the company said, We're going to have to restate our for 2026 notes, because the accounting for that was wrong. That's the first drop.

A week later, approximately, the company issues it's Form 10K in which the stock price drops again, and there were two more pieces of information that come out in the 10-K. One is that the company says, When we were accounting for the notes, we did not follow our controls and each year review the accounting for our complex issues. That's one.

Number two, they say -- and I want to read it -- they said, "Management concluded that due to material weaknesses in the company's internal control over financial reporting, the company's internal controls over financial reporting was not effective as of December 31, 2024 and in prior periods."

So, what the company told investors was, Our internal controls were bad; we had material weaknesses in 2024 and in prior periods.

So, I think when you start off with that admission from the company, and they're saying this is --

THE COURT: But they said it from day one, I thought.

MR. BLOCK: I'm sorry, Your Honor?

THE COURT: I thought they said that there were problems from day one?

MR. BLOCK: Well, there were, but -- I'm sorry. In --

THE COURT: They said a lot.

MR. BLOCK: In -- in the 2024 10-K, which is for the 2023-fiscal year, they said, We remediated all of our internal control, material weakness problems, and we did it across --

THE COURT: Was -- did they say all, or were they talking about the three that had been identified?

MR. BLOCK: Well, that's not how we read it, Your Honor. They say, "We increased monitoring and oversight activities across all business process areas."

So, that's across the board. And when you look at that -- and then when you look at what CW 4 tells us -- now, CW 4 was someone who worked -- it was a very small accounting department, worked in the accounting department, and their job was to work on remediating material weaknesses. And so let's just back up for a second.

You know, you've heard -- you've got deficiencies, you've got material weaknesses, and the material weaknesses is the higher one. Well, before you get to a material weakness, you've

got deficiencies, and you've got all these deficiencies that you are working on. And if you have enough of them, you have a material weakness.

So, what does CW 4 tell us? Well, CW 4 tells us, My job was to work on these; I had 90 of them -- all of them.

What CW 4 tells us, and there's nothing vague about this, and you can try to pick it apart as much as you want, CW 4 says they attended the board meetings and the audit committee meetings throughout 2024. And at those meetings, each of the directors who attended those meetings, including the executives, Ms. Wong and Ms. Peffer, that the company continued to have deficiencies in internal controls and material weaknesses. Their own consultant --

THE COURT: Do you allege that? Because that's something that they just argued that -- in the pleadings, you talked about deficiencies, but there was nothing specific about material weaknesses.

MR. BLOCK: Well, CW 4 says that the board and the audit committee were expressly told there continued to be material weaknesses, and we know --

THE COURT: Okay. Because this is that passive language that they talked about.

MR. BLOCK: I'm -- I'm going to get to that.

THE COURT: Okay. Okay.

MR. BLOCK: I'm going to get to that.

THE COURT: You may want to get there now, since I raised it.

MR. BLOCK: I'm sorry.

THE COURT: You may want to get there now, since I raised it.

MR. BLOCK: I'm going there right now, Your Honor.

Their consultant, Morgan Franklin, repeatedly told the board, We are continuing to work on internal controls and to remediate those problems. So the board and the audit committee is well aware, we've got these continuing internal control deficiencies. So, when Ms. Wong and Ms. Peffer continue to sign their stock certifications, and they say nothing has changed, that was false, and it was misleading, because they knew that there were these continuing problems with their internal controls.

And they were told this not only by what F(e)(4) told us was told, but also their own consultant reported and said, We're continuing to work on this. If there's not a problem, you're not going to keep working on it.

Now, what Ms. Smith also referred to was that, you know, you had Grant Thorton, and they were auditors, and you got a clean bill of health.

Grant Thorton specifically says -- because of the size of the company, they did not express any opinion on the company's internal controls. That was not something that Grant Thorton

looked at. So, you can't rely on Grant Thorton saying we gave you a clean bill of health because that's not something that Grant Thorton did. And Ernst & Young did not look at internal controls either. They simply prepared the 10Qs and the 10-Ks for filing. They were not involved in internal controls. It was Morgan Franklin, and Morgan Franklin told the board and the audit committee, We've still got these problems going on. And the company does not admit that during 2024, and we then know in 2025 the company says, Yes, we admit, we still have material weaknesses in 2024 and before that in prior years.

So, I know Ms. Smith has said, you know, SOC certifications, matter of law opinions -- that's not the case law.

And I think, if you just look at Judge Novak's decision in *James River*, he found the SOC certifications actionable. Those are statements. What courts will say is, if all you allege is that the company violated gap, that does not mean the SOC certifications by themselves are actionable. But I think we've done a lot more than that here. We've specifically alleged that management, Ms. Wong and Ms. Peffer, who signed those certifications, were specifically informed at these meetings of these problems; meaning that when they issued the certifications, they were false when they were issued.

Let me just also back up a little bit and talk about the overall bigger picture and the fraud. What you have is a company

that obviously had some pretty significant accounting issues.

And so, what we know is -- I'll start -- let me talk about the 2026 notes and the accounting for that.

We know the company got the accounting for that wrong. And, as Your Honor had said, you know, we allege and we say it's a very simple straightforward standard -- and it's a very straightforward standard. It says, if your debt component is subject to adjustment, which this was, if the stock price moved, there were more shares that got issued, you have to account for them separately, which is what they were supposed to do, and they did.

What the Defendants argue is, and they say, Well, this was a matter of judgment, there was a lot of judgment that we had to exercise, we went through the scope exceptions, and there were a lot of steps that we had to take in order to make that determination. But, Your Honor, there's nothing in the record that says that's what they did. There is nothing in this record which says that they went through these steps, and these were the scope exceptions that they relied on. It doesn't exist. These are facts that counsel is arguing and saying, Well, based on my facts, and based on here's the rule, so, judge, we're telling you this is what we did, but this is a 12(b)(6) motion. They don't get to make --

THE COURT: But the fact that they're working with an outside auditor, doesn't that bear on the analysis here?

MR. BLOCK: Well, two things here, Your Honor. Number one, we don't know that the outside auditor worked with them and said yes, that is the appropriate way to treat it.

We know Grant Thorton signed off on the 2021 financials, but we don't know what involvement they had on the notes.

And remember, it's the company's financial statements. The auditor just expresses his opinion saying, did you or did you not comply with gap? So -- but we don't know that. It's not in this record.

What we also know is that in 2022 and 2023, what Ms. Smith said is, every year they got their audit approval, and over the years they would look at the accounting for the notes. Well, that's not accurate. Every year they did not look at the accounting for the notes because, when they restated, they said, We didn't do what we were supposed to do. We didn't go back and look at the notes every year to make that decision.

So, I don't think you -- you don't really get the benefit of saying, our auditor signed off and said it was okay.

And, again, remember Grant Thorton, the auditor that signs off, said, We express no opinion on internal controls, because they didn't do that.

So, Grant Thorton doesn't know if in 2022 and 2023 they did what they were supposed to.

So, what you have is, as we've alleged and I think should be accepted as true, a pretty simple, straightforward accounting

rule which says this is how you're supposed to account for it. Then it becomes, well, why -- why would they have accounted for it the wrong way? Well, we say there were two reasons, Judge. One, because it dramatically would -- by not accounting for it correctly, it understated dramatically the cost of their debt.

So -- I just want to make sure I get it right.

As we allege in the complaint, the amortization and the debt cost, and the discount, was overstated by 500 percent in 2022 and 600 percent in 2023. And the loss, at least in 2023 alone, was understated by $10 million.

So, that's one reason, because you want to make the company look better financially than it really was by not accounting for it correctly.

And the second, and maybe a less significant point, but was, by having to account for them separately, as we say, it was very complex and very difficult; we require a lot of work.

So it's easier to say, Ah, let's not do that. But those are the two reasons why, and that's why we think, Your Honor, not only -- we don't think this is an *Omni Care* case because it wasn't judgment.

Now, maybe when we come back to summary judgment, there will be a record that will support what the Defendants are arguing. I don't know. We don't know right now what happened. We don't know because, if it's not in this record -- and I think it would be inappropriate to just assume that's what they did.

So, that's why we think those -- the notes were actionable.

Now, let me get to motive. And I understand, as, you know, Ms. Smith argued, you know, the BigBear Defendants had no motive. Why -- why would we have done any of this? Well, let's step back and use a little common sense. This company, BigBear, was created by AE partners. They pulled all these entities together, they created the company. They had five members that sat on the board of directors.

As the former employees told us, they were very active and very involved in the management and the oversight of this company, so they were in there.

They had at one point -- I believe it was 75 percent stock ownership of the company.

THE COURT: But case law says that that's not enough, just because you have --

MR. BLOCK: Well, but by also sitting on the board -- now let me also point to two other facts I think that are fairly telling here. Number one, AE adopts a 10b5-1 plan to sell pursuant to which it's going to sell its stock.

THE COURT: Its stock?

MR. BLOCK: Its stock. And my -- Mr. Gaines is going to address the whole question of who actually sold the stock. But what's interesting is BigBear is obligated under SEC rules to publicly disclose the 10b5-1 plan, but they didn't. They never publicly disclosed that plan, in violation of SEC rules. Why?

Well, I think the inference is clear. Because AE doesn't want people to know that it's going to sell its stock. It wants the benefit of the plan but without telegraphing what it's going to do.

Second, during our class period, BigBear adopts an insider trading policy which prohibits anyone from trading on nonpublic information, except for AE and its affiliates. Why is that done? I mean, who does that benefit? It benefits AE. So AE is setting itself up so that it can now start selling out its stock without violating any company policy, without telegraphing to the market or to investors what it's going to do. And it does so during a time period in which -- again, this starts in the spring of 2024 when BigBear says, We've remediated all material weaknesses, but they're being told at meetings, No, we haven't; we still have all these deficiencies.

And then what happens is -- so, in the March to fall of 2024 timeframe, they sell about a $100 million worth of stock.

Then you get to December.

Now, what we know in December is the company says, We've renegotiated the terms of our 2026 notes. And, as we've alleged, and as F(e)(4) has said, and I think it's common sense, too, if you're going to go out and renegotiate $200 million worth of notes, you're going to look at the terms, and probably somebody went back and said, well, how have we been accounting for this? Somebody must have realized, we may have a problem.

So, again, AE starts to sell. And between December of '23 -- I'm sorry, December of '24 and March of '25, including the day before the company announces it would have to restate -- I want to get back to that -- they sell $350 million worth of stock and liquidate almost their entire position in the company.

This is while these accounting issues are going on. And let me just point out: What the company said on March 18th was, we're going to have to restate our notes, but we need more time to do the calculations for that restatement; not we need more time to decide, do we have to restate? So that decision had already been made.

So, I think it's very fair to infer that, before March 18th, the company knew it was going to restate. And if there's a restatement, it's hard to imagine that the audit committee and the board is not aware, which includes members of AE.

So AE is now selling all this stock while the company is preparing to restate its financials and while its got these accounting problems. So I think -- I think that gives you the motive. I think we cited Your Honor to the *Scholes* case, which is a similar situation, and you've got five people sitting on the board. And to say, Well, why would we do anything for them? Because they're the board. They're, essentially, your bosses. And they exempt themselves from an insider trading policy. They -- the company does not disclose the 10b5-1 plan, which only benefits AE. So, I think that shows you how management is acting

to benefit AE. So, I think, when you step back and you add it all up, Your Honor, I think you see that this pleading pleads and shows how the company engaged in accounting problems, and how they concealed them from investors, and they did so at a time to allow their controlling shareholder and the majority of the board to get rid of all of its old stock until about $450 million is left. Unless Your Honor has any other questions, I don't think I have anything else.

THE COURT: I don't.

MR. BLOCK: Thank you, Your Honor.

THE COURT: Do you have any rebuttal?

MS. SMITH: Very briefly, if I may, Your Honor.

THE COURT: Go ahead.

MS. SMITH: I promise to be short. Okay. So, I -- I -- just to address a question that Your Honor asked about paragraph, 62 and the CW allegations.

Mr. Block, I think again, was a little bit vague, but I'm going to read to you the specific allegation from paragraph 62 about what was presented by Morgan Franklin to the board, and I'm quoting: "The internal auditor, Morgan Franklin, made quarterly presentations to the audit committee and the whole board as required by the Sarbanes-Oxley Act. Morgan Franklin presented the status of all internal control deficiencies and remediation efforts at these quarterly audit committee and board meetings, which were also attended by CEO Long and CFO Peffer."

Status doesn't say what the presentation actually said. What they say is, "The status was presented."

There's no allegation by CW 4 as to what was actually in that presentation other than the status, and the status could be, "we don't have any," or it could be, "we have some, but we don't know," because the allegation does not say. So, I think that's an important clarification, Your Honor.

I would also note there's no reference to material weaknesses there. So, even if you draw the conclusion from that that those are deficiencies, there's no allegation about a material weakness having been presented to the board or the audit committee. So, on the Grant Thorton sign-off, it is correct Grant Thorton did not sign off on the operation of the internal controls, but Grant Thorton absolutely did sign off on the gap accounting presented each year, as Mr. Block, himself, articulated. And the GAAP accounting for the notes is contained in each financial statement.

So Grant Thorton in signing off on those financial statements has to have approved the accounting for the things that are in the financial statement subject to GAAP unquestionably. So that takes care of that as well.

And then just briefly on the change to the insider training policy. The plaintiffs don't actually allege there was a change. They say there was a change, but they don't say what the insider training policy was before or after, which is an

important omission, because it wasn't actually changed. But we don't have the allegations that show there was a change. There's no inference there, in terms of BigBear supposedly trying to help AEP. And then just briefly, *Scholes* --

THE COURT: Why the exclusion, though? Because they -- you know, there's an exception for --

MS. SMITH: Yes. I mean, the real answer is -- I just know the real answer, but it's outside the record, so -- yea.

THE COURT: Then don't.

MS. SMITH: And then on *Scholes Technologies*, which is the only case that plaintiffs state with respect to BigBear supposedly having been -- a court concluding that you can infer from somebody else's trades that -- that BigBear and the Defendants acted with motive. That's not actually what *Scholes* says. It -- it points to two particular defendants, and I would -- Your Honor can read it, but it points to two particular defendants who traded, and says that was good enough for their scienter. And then the Court goes on to conclude scienter for everybody else based on everything, but not just the trades. It was all of the allegations that were alleged in that case, so that doesn't support them either. So that's it. Thank you, Your Honor.

THE COURT: Thank you. We're going to take a 15-minute recess before we resume with the AE motions.

(Thereupon, a recess in the proceedings occurred from

10:57 a.m. until 11:19 a.m.)

THE COURT: Okay.

MR. SCHOLES: May I be heard?

THE COURT: Yes.

MS. SMITH: Your Honor, just one thing really quickly before we recommence. I omitted to introduce my client, Ms. Carolyn Blankenship, who is here in the courtroom here today.

THE COURT: Okay.

MS. SMITH: She's the general counsel of BigBear, so I just wanted to put that on the record.

THE COURT: Good morning, ma'am.

MS. BLANKENSHIP: Thank you, Your Honor.

MR. SCHOLES: Good morning, Your Honor. Once again, Steve Scholes on behalf of AE Industrial.

And, if it's acceptable with the Court, I would like to start with your first question this morning, to try to categorize, organize if you will, the nature of the claims pending against AE Industrial.

And, generally speaking, they are of two types. There is a misstatement claim and an insider trading claim, broadly speaking.

And if it please the Court, I would like to address the misstatement claim first. And I would submit, Your Honor, that that claim, as against AE Industrial in particular, is incredibly narrow involving a single statement in a single document out of

all of the statements and all of the documents alleged.

And let me take just a moment, if I might to explain.

As you know, the Plaintiff's theory as to why the AE Industrial is the maker, if you will, of the alleged misstatements under *Janice*, is because certain of the BigBear directors who signed the statements were affiliated with AE. That's the theory.

It starts there; it stops there. There's no other theory that we're dealing with. Of all of the filings that plaintiffs allege contain affirmative misstatements, there are only three that BigBear director signed. Those are the 10-Ks for year 2021, for year 2022, and year 2023.

None of the BigBear directors signed any of the forms 10-Q or any other filings that are alleged in the complaint.

So, those are the only documents regarding misstatements that are at issue with regard to AE Industrial.

Now, narrowing that field further, we can eliminate, I would submit to Your Honor, the 2021 and 2022 10-Ks because, as plaintiffs themselves -- they expressly state this in their briefing, that the case for misstatements against AE Industrial begins on March 15th of 2024 when the 2023 10-K was filed.

That's the first time that AE Industrial is charged with a misstatement, even though BigBear directors affiliated with AE signed the 2021 and 2022 10-Ks. So those are out of consideration with respect to AE Industrial in connection with

alleged misstatements.

Furthermore, I think we can narrow it one more time, and this is the last narrowing, I promise, Your Honor. There is a single misstatement in that single document that plaintiffs lay at AE Industrial's feet, and that is the statement by BigBear management that BigBear management considered the three specific controls previously alleged to be deficient remediated. That's it. That is the one misstatement at issue with respect to BigBear. Why do I say that? The accounting issues in that one document that's at issue with respect to AE Industrial are not at issue with respect to AE Industrial because Plaintiffs explicitly allege, and they acknowledge in their briefing, that AE Industrial did not learn about the accounting issues until December 2024 when the renegotiation of the notes occurred that you've heard discussed earlier here today.

So, because the 2023 10-K, the one document at issue with respect to BigBear, was filed on March 15th, '24 and because AE Industrial didn't learn about accounting issues until December of '2024, those accounting misstatements cannot be at issue with respect to AE Industrial.

So, on the 10b-5(b) claim, bringing it back to the counts actually alleged, that is a single statement in a single document at issue with respect to AE Industrial.

And, Your Honor, if I may, I don't think this complaint comes close, close to alleging a 10b-5(b) claim for -- for

misstatements against AE Industrial.

They have not alleged that AE Industrial made, within the meaning of *Janice*, that that alleged misstatement -- and, in fact, the factual circumstances of *Janice* are on all fours with this one. In *Janice*, the alleged misstatements were made by a mutual fund. One of the directors on the mutual fund was associated with the investment advisor to the mutual fund.

The plaintiffs tried to charge both the fund and the investment advisor with misstatements because of that single sort of cross-pollination, if you will, between the fund and the advisor. And the Supreme Court said, no, that's not enough. That does not render the advisor the maker of the fund statements. The fund is a separate, cognizable legal entity with its own board of directors, who have their own fiduciary duties. We are going to recognize the separate corporate existence of each of those two entities. And just because a director may have an affiliation with another company, that doesn't render the other company a maker of the mutual fund statements.

That is exactly the theory that is being submitted against AE Industrial, and, because of *Janice*, it fails.

And all of the case law that has followed *Janice* that has addressed this issue has reached the same conclusion. There's not a single authority that we've been able to find -- certainly there's not a single authority that the plaintiffs have cited so far -- that comes to any different conclusion. And so, Your

Honor, I believe that Count 1 has to be dismissed for that reason in and of itself and standing alone.

There's another reason it should be dismissed. It's because that statement was not false. It's not alleged to be false. The internal controls that management said were remediated were three in number. They were very specific. They related to segregation of duties, IT general controls, and revenue recognition. Those are the three internal controls that management said were remediated.

The control disclosed later in 2025 that they said also had a material weakness was a new control relating to the review of technical accounting policies. And, even in the complaint, the plaintiffs recognize that was a new material weakness. It's not a material weakness that related back to the three that were stated as being remediated. And there's no allegation -- there's no argument, there's no allegation that any of those three particular controls were, in fact, not remediated.

So, AE Industrial didn't make the statement, and the statement wasn't false, and that claim's got to go away.

I would respectfully submit that they haven't alleged scienter either. They completely ignored and sort of tacitly conceded the points we made in our brief that do not establish a scienter.

The fact of the restatement itself, other factors, they ignore those, and they rely on two and only two arguments for why

AE Industrial reacted with scienter. Yes.

THE COURT: I do have a question.

MR. SCHOLES: Please.

THE COURT: And I don't know if you would be able to answer it or not, because what they have asked is, if I were to agree with you in terms of them -- AE not being the maker of the statement, if they should have leave to amend to add the individual board members or the subsidiaries under an agency theory.

MR. SCHOLES: Yes, Your Honor. I noticed that. As I stand here before you this morning, I only represent AE Industrial.

THE COURT: That's why --

MR. SCHOLES: And so here's what I can tell you. This is going to be a partial response. I apologize in advance.

THE COURT: It won't matter, because scienter isn't there, is that what you were going to say?

MR. SCHOLES: Yes. Well, correct. Plus, in terms of leave to replead, given -- I don't think leave to replead should be given with respect to AE Industrial because of the -- of the complete failure, the deficiencies that we have pointed out that they have stood by and tried to defend and haven't come close to reconcile, I just -- bear with me on that, Your Honor. I know that's an unusual ask, and I acknowledge that it is. But, under these circumstances, you know, the -- the Court, obviously,

will do what it feels best with respect to leave with respect to others. I can't speak to them at this point in time, but there is no scienter as to AE Industrial either. They rely on the same representation theory. They rely on trading. And I -- Mr. Block stood here just a few moments ago and said AE Industrial sold the stock -- sold that stock, entered that plan, did -- there is no allegation that AE Industrial did any of that stuff. There's not a single allegation. The complaint, in fact, is diametrically -- affirmative allegations diametrically oppose and are irreconcilably inconsistent with what Mr. Block just told you.

THE COURT: Well, I don't need you to -- because they said they are going to address that, and I want to hear from them.

MR. SCHOLES: That's fine, Your Honor.

THE COURT: But you'll have an opportunity to come back.

MR. SCHOLES: I was just going to say, I'll look forward to that, if I need to.

There is -- these elements aren't often discussed, but I think they are critical elements, and they must be alleged. In terms of reliance, there is no alleged individual reliance on anything that AE Industrial did or failed to do. It's not in there. The basic presumption of reliance in a case of affirmative misstatements is not available to a nonspeaking -- as to a nonspeaking defendant. AE Industrial is a nonspeaking defendant. The basic presumption doesn't apply. Neither does the other available presumption of --

THE COURT: Thank you.

MR. SCHOLES: Okay. Thank you, Your Honor. May I go to 20 small a?

THE COURT: No, no you may not.

MR. SCHOLES: No?

THE COURT: Okay. Because if there's no Count 1, I don't need to get there, right?

MR. SCHOLES: No. I think you might need to get there -- 20 small a, Your Honor, is the control person claim, the claim that AE Industrial controlled others as a controlling shareholder who may have acted in violation of the law.

THE COURT: But doesn't there still need to be a predicate act?

MR. SCHOLES: Yes, there does.

THE COURT: Okay.

MR. SCHOLES: Yeah. There does. Well, I would agree with you, Your Honor. If there's no predicate act, we --

THE COURT: -- thank you --

MR. SCHOLES: -- we don't need to address 20-A.

THE COURT: Thank you.

MR. SCHOLES: Okay. That's great. May I address the --

THE COURT: You may not. Can I please hear from them, and I will give you another opportunity to return.

MR. SCHOLES: Absolutely. Absolutely, Your Honor. Thank you for hearing me out. I appreciate it.

MR. GAINES: Good morning, Your Honor. Michael Gaines on behalf of the lead plaintiffs. And I'm obviously here to argue against AE's motion to dismiss.

I want to start, based on your questions and comments this morning, with AE's -- the 10b-5(a) and (c) insider trading claim that we make against AE Industrial.

And so, making out a 10b-5 insider trading claim requires a couple of -- a few elements. You need to have a corporate insider who trades while in possession of material, nonpublic information, and it needs to be in violation of a duty owed to shareholders, and that requires also an element of scienter, a state of mind.

And so here, we think we have clearly pled that AE is a corporate insider. AE --

THE COURT: Okay. I want you to step back and start with how they are the makers of the statement, and also address how they were selling stock, because I thought the stock was owned by the subsidiaries.

MR. GAINES: Yes, Your Honor. I think those are two different questions. Would you like me to start with the stock sales?

THE COURT: Those are the two I need you to address.

MR. GAINES: Understood.

THE COURT: In either order.

MR. GAINES: I think first, with respect to the stock

sales, I mean I think this -- the short answer is this purely elevates form over substance. You have a whole bunch of shell subsidiaries entities through which AE, I don't know, organizes its investments. But BBAI Ultimate Holdings, LLC is not a company with an office and a bunch of employees and a separate business. It's just a shell company through which AE holds its investments. So, to say that if I put all of my stock over here --

THE COURT: But why not -- but aren't we supposed to respect corporate formalities?

MR. GAINES: Sure. And I -- I guess my response would be, to the extent that AE does, as well. But AE has, I think, played fast and loose with the corporate formalities. They've taken advantage of their standing with five of their own partners on the board when it suits their needs. Like -- you can only enter into a 10b5-1 trading plan if you are a corporate insider, and that is entered into on behalf of the general partner, which is Aero Equity -- the general partner of the limited partnership that is AE, and Aero Equity is on those form fours as having sold stock. That is the member of BBAI Ultimate Holdings, LLC.

THE COURT: Member.

MR. GAINES: I'm sorry.

THE COURT: You just said it's the member.

MR. GAINES: Yes. Like, an LLC is made up of members, and a limited partnership is made up of general partners and limited

partners. And I'm simply saying the general partner of the limited partnership that is AE Industrial Partners, LP is also the member of BBAI Ultimate Holdings, LLC, right? They are ultimately the same people.

THE COURT: And I understand that argument.

MR. GAINES: Yep.

THE COURT: But I'm not so sure you can short-circuit it like that.

MR. GAINES: I -- I understand Your Honor's point. And I guess what I'm saying is they treated the corporate formalities when it suited them, and they also ignored them when it suited them. And so they entered into an insider trader -- a trading plan under Rule 10b5-1.

They deputized, they named -- they deputized themselves AE Industrial Partners as an insider, based on their partners on the board. You can't do that unless you are a corporate insider.

So, they said we are a corporate insider when we want to sell shares and take advantage of a 10b5-1 plan, which is supposed to be an affirmative defense to insider trading, but then now they want to argue that it wasn't us who was sharing shares; it was our subsidiary shell company that we held these shares through.

Separately, AE Industrial Partners LP is the one who is exempted from the insider trading policy. It doesn't say BBAI Ultimate Holdings, LLC, it says AE Industrial Partners, LP and

its affiliates are exempted from the insider trader policy.

So, when it suited themselves, they were identified as the parties selling shares, and when it didn't suit them, apparently now when they're being sued for insider trading, they want to adhere to the corporate formalities.

But it -- but, Your Honor, I think it defies reason and the purpose of the securities law is if you can say, I put on all my shares over here in a shell company, the brains of the operation is over here deciding what that does, because there's no separate employees of BBAI Ultimate Holdings, it is AE Industrial Partners that decides what to do with its assets. It just decided to organize them through a bunch of shell entities.

So, we think, at a minimum, to the extent that those corporate formalities are, you know, due any regard, there is a -- there's a well-pleaded basis for veil piercing.

And I don't know what discovery will show -- and to the extent that Your Honor thinks that we need to name those entities, even though they probably don't hold any assets anymore, and they probably don't have -- it's an empty shell at this point, if it still exists, we would request leave to amend to name them, Your Honor, because we think that the activity that we've alleged clearly states trading while on the -- while possessing material and nonpublic information and in violation of a duty to the shareholders.

THE COURT: Let's step back and now address the issue of

whether or not AE is still the maker of the statements.

MR. GAINES: Sure, Your Honor. And I will concede I think that is their strongest argument here, is on the maker liability. My response, I guess, would be twofold.

One, I don't think that *Janice* is a perfect parallel. *Janice* doesn't talk about whether a signer is respon- -- makes a statement. And here we've alleged that the directors of BigBear were also partners of AE. And so, you know, I think that counsel has been careful to describe them as having been affiliated with AE, but they are AE, they are the partners of AE.

So, I think the only question before Your Honor, then, is in who -- in what capacity were they signing those -- the SEC's disclosures? And we think, at least, and we've alleged that there is an issue of fact as to -- on whose basis were they signing.

Certainly, the facts could show that they were just signing as directors of BigBear. That doesn't implicate AE. But a private equity firm, you know, who buys companies, takes them public, and intends to exit, that is the whole purpose -- that is their business. And so if, at the end of the day, they are doing the work of the private equity firm --

THE COURT: But we still have -- what we have are individual directors, right --

MR. GAINES: Yes, Your Honor.

THE COURT: -- who are serving in that capacity with

BigBear?

MR. GAINES: Yes, Your Honor.

THE COURT: And they are the ones signing this 2023 --

MR. GAINES: -- the 10-K, yes.

THE COURT: -- the 10-K.

MR. GAINES: I agree with all of that, Your Honor. And I think -- what we have alleged is that there is an issue -- there's a question of fact as to whether, when they signed, it was properly understood as in their capacity as directors of BigBear or also perhaps --

THE COURT: You're calling it an issue of fact, but how so? How is that an issue of fact?

MR. GAINES: Yes, Your Honor. I think we've alleged their level of involvement and their -- and BigBear -- and ultimately AE's control over BigBear.

So, unlike some of the cases that they've cited, and I think that --

THE COURT: Because cases have been clear that even having, you know, a presence or you having dual roles, perhaps, it's not enough to show that the -- that in this case AE Industries would have the authority and control over the statement being made.

MR. GAINES: Your Honor, I think -- I think the question was presented slightly differently in some of the cases that are referenced. The one that I think is maybe most on point and most

helpful is the *Haywood Holding* case, in which you had multiple private equity firms that collectively owned an overall majority of the shares but each independently had a minority interest, and -- but they also had an agreement to work together, and a number of affiliated -- and there the word "affiliated" makes sense because they weren't all members of these private equity firms. Some of them were just individuals who were appointed by those firms, but they didn't actually have a stake in those private equity firms. And those individuals were appointed to the Haywood Holdings board.

And there the Court said that majority controlled the stock, combined with affiliated directors, that, in and of itself, isn't enough to allege that they controlled the statements that were being made. But here we have a bunch of additional facts. We have allegations about the actual level of involvement of the AE partners who, admittedly, they were serving as directors on the board, but they are partners of AE, not just independent individuals who AE appointed to represent them. These are actual partners of the private equity firm.

And we've alleged, based on F(e)(4), that they were deeply involved in BigBear's financial oversight and the company strategy. They received detailed information about the company's financials. And the board meeting -- board and audit committee meetings were often contentious with conflict stemming from competing priorities between the AE affiliated faction of

directors and everybody else. So we think we have at least alleged -- we have alleged enough to say that --

THE COURT: Even if I accepted all of that --

MR. GAINES: Yep.

THE COURT: -- is the statement false? Have you sufficiently alleged -- because if it's only this statement at issue, referring to the three specific -- I don't know.

MR. GAINES: The material weaknesses, Your Honor, and internal controls over financial reporting.

THE COURT: Right.

MR. GAINES: Yes.

THE COURT: And that those were considered remediated, were they false?

MR. GAINES: So, Your Honor, to address that question specifically, I think the first thing is -- I just want to correct for the record, as Ms. Smith pointed out, in paragraph 65, that's indeed a typo, F(e)(4) worked on the fiscal year 2023 10-K, which was then released in 2024.

But, to answer that question directly, we think two things. One, we think that they hadn't remediated the material weaknesses. The company said that they did. And we think that F(e)(4) clearly says they're still continuing to remediate the deficiencies and internal controls. And it is those deficiencies that make up the material weakness, and that they were still working on that beyond the time when they publicly said we've

remediated our material weaknesses over our financial reporting controls.

Second --

THE COURT: Over the three.

MR. GAINES: Your Honor, they do -- they previously announced three, and they said that we fixed them. They also said that we implemented all of these changes across the board. And that gets to my second point, which is that it's still materially misleading to say, we fixed all the problems that we had, if you know that there are new ones that came up. It's saying the good and leaving out the bad. If you're talking about your deficiencies in internal controls and financial reporting and the material weaknesses that they caused, it's materially misleading to say, We fixed these other three things, even if that's true, if a bunch of new one's have cropped up in the same amount of time, because it gives a misleading impression of the state of affairs of the company's internal controls or financial reporting. And that's ultimately what we learned later in the March 2025 disclosures is, Oh, there's a bunch of other problems, too, and those existed in prior period, we're just telling you about them now.

So, we think we have fairly alleged that there's an inference, a -- a well-founded inference to be drawn that at no point in time did the company maintain adequate internal controls or financial reporting. The company said we fixed a bunch; they

didn't tell you about new one's that cropped up if they had actually fixed them, but we think they hadn't. And then later you find out about new ones that apparently persisted as well throughout 2024.

So, we think we have alleged that, in fact, that statement, the affirmation that we've remediated these internal control -- material weaknesses, that that, in fact, was materially misleading, if not outright false.

THE COURT: Okay.

MR. GAINES: Your Honor, if I could, I just want to pivot to the insider trading allegations.

THE COURT: Go ahead.

MR. GAINES: Because, honestly, I think that is where we have the most clearcut case against AE Industrial.

And I'm going to work backwards in chronological order. Because I think starting with the trades in December of 2024 and March of 2025 is when you have the most clear instance of them having sold shares while in possession of material nonpublic information, information that is material to the company that hasn't been shared with the public.

And so we know that on December 19th 2024, the company announces that they have -- that they're renegotiating the convertible notes that we've talked about.

And we've also alleged, based on F(e)(4), that the process -- and I think also just common sense. When you

renegotiate those notes, you're going to look at the terms of those notes. And that has to be when -- if they didn't know earlier, they knew by then that we're going to have to redo our accounting for these notes, and that's going to require restating our financials going back, basically, to the beginning.

So, while AE knows that, AE then sells a bunch of shares. And regardless of whether AE intended to exit its position all along or whether that was a new decision to get out quick before we have to share bad news, they were legally obligated not to trade because they knew material information that hadn't been disclosed to the public yet, and it is that straightforward.

So, the only question there, I think, that we haven't talked about is whether AE is a corporate insider, and we think it's very clear that AE is a corporate insider. They created the company. When they took the company public, they retained 83 percent and a half of the company's equity.

Even as late as March of 2024, they owned 75 percent of the company's equity. And up until the end -- their substantial -- until they got through December, when they finally made some huge sales of hundreds of millions of dollars in stock, they still retained up to a third of the company.

More importantly, five of their partners sat on the board, and one of the members was on the audit committee.

Later in January of 2025 --

THE COURT: I'm letting you make this record.

MR. GAINES: -- I'm sorry.

THE COURT: I said, I'm letting you make this record.

MR. GAINES: Yep.

THE COURT: But I'm still not at the point where I am seeing them as the owners of the stock.

MR. GAINES: Understood, Your Honor. And I think that we've probably said all that we can on that point. We think it elevates form over substance.

THE COURT: You've said that.

MR. GAINES: Right. And we think that's ultimately the conclusion, but, Your Honor, we would ask, if that is Your Honor's conclusion, we would definitely ask for leave to amend to name those entities that we've identified in the complaint as having been the shell companies through which they held these investments, and we would ask for leave to replead to add those individual entities.

I mean, we think, ultimately, what you end up with is a world in which one company, if we're respecting those formalities, holds the shares and sells them. It doesn't have the ability to make any decisions though, because it's the private equity firm that actually makes decisions on what to do. So, you are separating the brain from the hands, essentially. And, to me, that sort of defeats the purposes of the securities laws because it allows sort of games to get in the way of enforcing the law.

THE COURT: Or charge it in a way -- or we charge it in a way that doesn't allow that.

MR. GAINES: I don't know, Your Honor. And if that's -- if that's Your Honor's conclusion, that's why we ask for leave to replead.

THE COURT: Thank you.

MR. SCHOLES: Thank you, Your Honor. I'll be brief. As to the 10b5-1 plan, that was not AE Industrial's, that was BBAI Ultimate Holdings. It's exhibit -- Supplemental Exhibit 1 or 2. I've forgotten which.

As to the capacity in which the BigBear director signed the 2023 Form 10-K, I would refer Your Honor to Exhibit 12 where the signature page on Exhibit 12 says, and I quote, "This report has been signed by the following persons on behalf of the registrant --" that's defined as BigBear "-- and in the capacities indicated." The capacities indicated are directors. That's the only capacity in which those individuals acted. That is -- that is in the record, Your Honor.

Bear with me -- as to the notions about shell companies and AE, that's alleged. All of what you just heard about shell companies and the PE firm controls the shell company, none of that is anywhere in this complaint, and thus is completely irrelevant, I think, to our motion.

And on the insider trading, Your Honor, I'm not going to -- I don't think I need to belabor the point. If Your Honor

has questions, I'll be happy to answer them, but you can't trade where you're not alleged to have owned based on inside information you're not alleged to have had. And I think that sort of wraps up the case on the insider trading claims.

Unless you have further questions, I'll conclude my remarks now.

THE COURT: Okay. I don't.

MR. SCHOLES: Thank you, Your Honor.

THE COURT: I'm going to take this matter under advisement and issue a decision.

I want to thank counsel for the quality of your briefing, as well as your advocacy here today, both sides. Very well done.

MS. SMITH: Thank you, Your Honor.

MR. GAINES: Thank you, Your Honor.

(Proceedings adjourned at 11:50 a.m.)

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

6/10/26

/s/ Scott L. Wallace

------------------------------ -----------------

**Scott L. Wallace, RDR, CRR** **Date**
**Official Court Reporter**

**C E R T I F I C A T E**

I, Scott L. Wallace, RDR-CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Scott L. Wallace [!CURRENT DATE]

---------------------------- -----------------

**Scott L. Wallace, RDR, CRR** **Date**

**Official Court Reporter**